**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Michael G. THEVIS, Alton Bart Hood, Global Industries, Inc., Anna Jeanette Evans, Defendants-Appellants.**

No. 79–5739.

United States Court of Appeals, Fifth Circuit.*

Unit B

Jan. 11, 1982.

Rehearings Denied March 3, 1982 in Hood and Global Industries, Inc.

Rehearing and Rehearing En Banc Denied March 3, 1962 in Thevis and Evans

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Bobby Lee Cook, Summerville, Ga., Wm. W. Taylor, III, Lawrence A. Katz, Washington, D. C., Edward T. M. Garland, Atlanta, Ga., for Thevis.

Joseph Beeler, Miami, Fla., Steven H. Sadow, Atlanta, Ga., for Global.

Wm. Ralph Hill, Jr., Lafayette, Ga., for Hood.

Edward E. Strain, III, Cornelia, Ga., for Evans.

Dorothy Y. Kirkley, Craig A. Gillen, Asst. U. S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before KRAVITCH and THOMAS A. CLARK, Circuit Judges, and THOMAS **, Senior District Judge.

KRAVITCH, Circuit Judge.

Appellants Michael Thevis and Global Industries, Inc. [Global] were convicted by a jury of violating the Racketeer Influenced and Corrupt Organizations Act [RICO], 18 U.S.C. § 1962. Thevis and appellants Anna Jeanette Evans and Alton Bart Hood were convicted of conspiracy to violate the civil rights of Roger Dean Underhill under 18 U.S.C. § 241 by preventing him from testifying at trial. All appellants claim that the trial court erred in several evidentiary rulings, chiefly objecting to the trial court's admission of Underhill's grand jury testimony as a hearsay exception under Fed.R. Evid. 804(b)(5) and the trial court's refusal to grant judicial use immunity to defense witness George Thevis. Appellants also claim that the trial court misconstrued RICO and incorrectly charged the jury; and appellants Thevis, Evans and Hood argue that the conspiracy charged under 18 U.S.C. § 241 is not a crime. Finally, appellants Evans and Hood claim their trials should have been severed, and the evidence was insufficient to convict them of the conspiracy. For the reasons stated below, we affirm the convictions of all defendants.

I. Background

The original indictment in this case, filed on June 10, 1978, named Michael G. Thevis, Global Industries, Inc., Fidelity Equipment Leasing Corporation and eight other individuals as defendants. The central allegation was that Thevis and the corporations had conducted an interstate pornography business through a pattern of racketeering activity. Roger Dean Underhill, a principal witness before the grand jury, was named as an unindicted co-conspirator. On October 25, 1979, the grand jury returned a superseding indictment which added a charge that Thevis, Jeanette Evans and Bart Hood conspired to murder Underhill in order to prevent his testimony. Seven of the original defendants were not reindicted and their cases were dismissed. Only Counts One, Two and Ten of the indictment are relevant to this appeal.[1] Count One alleged a substantive RICO violation and Count Two alleged conspiracy to violate RICO.[2] Count Ten, the charge added by the superseding indictment, alleged a conspiracy among Thevis, Evans, and Hood to deprive Underhill of his civil rights in violation of 18 U.S.C. § 241. The trial lasted approximately eight weeks and produced a

** The Honorable Daniel H. Thomas, Senior District Judge for the Southern District of Alabama, sitting by designation.

1. The court granted Fidelity's motions for acquittal on all counts, and also granted motions for acquittal by all defendants as to Counts Three through Nine. William Ross Mahar, a Thevis associate who also was named in the superseding indictment, died during trial, and the charges against him were dropped.

2. Counts One and Two named Thevis, Global, Fidelity, and Mahar as defendants. Fidelity, which was the parent corporation to Global, which in turn was the parent to several of Thevis' adult entertainment corporations, including Cinematics, and Automatic Enterprises. Underhill, Clifford Jennings Wilson, and Jeff Lee were named as unindicted participants in Count One and as unindicted co-conspirators in Count Two.

voluminous record.[3] Our recitation of the facts is therefore limited to only those absolutely essential to this appeal.

In the 1960's, Michael Thevis organized and controlled a group of corporations whose principal purpose was the profitable distribution of adult books and films. Underhill met Thevis in the fall of 1967 and became a Thevis employee. Together, Underhill and Thevis developed a profitable peep-show machine that was manufactured and distributed by two Thevis-controlled corporations, Automatic Enterprises and Cinematics. The government offered evidence as to five separate acts of racketeering in the conduct of this peep-show enterprise. These acts were the murders of two competitors in the adult entertainment business, two separate acts of arson against competitors, and the murders of Underhill and a bystander, Isaac Galanti.[4]

### The Hanna Murder

Kenneth "Jap" Hanna owned several adult book stores in Atlanta. On November 13, 1970, Thevis called Underhill at 8:30 a. m. and told him to come to work immediately. When Underhill arrived, Thevis stated that he had shot Ken Hanna and left the body in the trunk of Hanna's car in Thevis' warehouse. In his haste to dispose of the body, Thevis had left the car keys in Hanna's pocket, locked in the trunk. Thevis asked Underhill, a trained locksmith, to open the trunk and retrieve the keys. Thevis and Underhill then drove the car containing Hanna's body to the Atlanta airport parking lot and left it. Afterwards, Underhill took various steps to dispose of any incriminating evidence, including burning the moving pad on which Hanna's body had lain and replacing several bloody floor boards in the warehouse. In addition, he bought a welding torch outfit and melted the gun, the trunk lock, Hanna's car keys, some Mexican coins which had been in Hanna's possession, and a screwdriver. That night Underhill dumped the melted objects and the bloody boards in the Chattahoochee River.

During an interview with the FBI in 1977 Underhill showed agents the spot on the Chattahoochee where he disposed of the melted objects. A government diver found a pan containing melted objects. Analysis of the melted debris revealed two General Motors car keys, some Mexican coins, and a screwdriver on which appeared the letters "R", "D", and the beginning of either a capital "U", "B", or "W".

### The Mayes Murder

Jimmy Mayes was employed by Thevis and Underhill to build peep shows. Underhill paid Mayes by giving him a percentage of his stock in the peep-show corporations. When Thevis took away half of Underhill's and Mayes' shares, Mayes became enraged and threatened to kill Thevis. In December of 1972, Thevis ordered Underhill to kill Mayes and gave him a gun for that purpose. Underhill had a chance to shoot Mayes one night, but could not pull the trigger. At Thevis' instruction, Underhill then hired Bill Mahar to do the job. Mahar told Underhill that he was going to kill Mayes by putting a pipe bomb in his truck. The bomb went off just before midnight, and literally blew Mayes to pieces.

Thevis was at this time in the hospital due to injuries sustained in a motorcycle accident. On the day of the murder, Underhill advised Thevis that the explosion would take place that night. After the explosion, Underhill went to the scene and found a piece of bone and a gold pin. He showed this evidence to Thevis in the hospital; Thevis said that he planned to make the bone into a paperweight. The day after the murder, Thevis instructed his nephew, Mann Chandler, to give Underhill money from Thevis' safe to pay Mahar.

### The Louisville Arson

Nat Bailer, a competitor of Cinematics in the peep-show industry, owned a warehouse

---

**3.** The record on appeal consisted of 118 volumes comprising nearly 16,000 pages.

**4.** Although the Underhill-Galanti murders were predicate acts under the RICO counts, the indictment did not implicate Global in those murders. Global also was not charged in Count Ten.

in Louisville, Kentucky. Thevis ordered Underhill to go to Louisville and burn the warehouse. On the weekend of April 27, 1976, Underhill drove to Louisville and, with two Thevis employees, Clifford Wilson and Robert Mitchum, set fire to the warehouse. Returning from Louisville, Underhill called Thevis and reported their success. The former Mrs. Underhill corroborated Underhill's out of town trip on April 27, 1970. She also noticed that he was dirty and smokey when he returned and remembered that he wanted to get rid of the clothes he was wearing.

*The Fayetteville Arson*

In 1972, Thevis operated an adult bookstore in Fayetteville, North Carolina. Herman Womack owned a competing bookstore just one block away. Thevis told Underhill to burn down the competitor. On September 19, 1972, Underhill and Mahar drove to Fayetteville and accomplished the arson by drilling a hole in the roof of the building, pouring gasoline down into the interior, and igniting it with a water pistol used as a flame thrower. Afterwards Thevis gave Underhill $1,500 with which he paid Mahar for the successful arson.

*The Underhill-Galanti Murders*

Under duress from Thevis, Underhill sold his interest in Cinematics to Thevis in 1971, but remained on Thevis' payroll (at about $50 per week) until Underhill went to prison in 1974. In 1975 Underhill filed a civil RICO suit against Thevis. While Underhill was in prison, the government sought unsuccessfully to get Underhill's cooperation in its investigation of Thevis. Underhill was paroled in January 1977 without having reached any specific agreement with the government. Following his parole, Underhill was granted immunity and began to cooperate. He gave lengthy recorded statements to the FBI in January 1977 and testified before a federal grand jury in May 1977. In June 1977, Underhill visited Thevis in the federal prison in Springfield, Missouri. Underhill wore a shoe mike provided by the FBI and recorded his conversation with Thevis. During this conversation Underhill told Thevis of his interviews with the FBI and that he had taken and passed a polygraph examination.

On April 28, 1978, Thevis escaped from the New Albany, Indiana, jail where he was confined during the trial of a civil case arising from the Louisville arson. Soon after his escape, he contacted defendants Evans and Hood. Jeanette Evans, a real estate agent in Marietta, Georgia, was a close personal friend of Thevis. Bart Hood, her cousin, was a detective in the Summerville, South Carolina, police department. Evans and Hood assisted Thevis in establishing several aliases, in obtaining an apartment, a VISA credit card, and safe-deposit boxes.

Hood and Evans requested Dennis Bradley, their mutual cousin, to make silencers for a .38 caliber pistol. Evans also inquired about a silencer for a 30.06 rifle. Bradley made two silencers; he mailed one to Hood in Summerville on October 20, 1978, and Hood picked up the second silencer late in the afternoon on October 25, 1978. Hood normally kept a shotgun and a 30.06 rifle in the trunk of his car. On November 5, 1978, he reported the theft of the two guns to the Summerville police but requested that the theft receive no publicity.

Records indicated that Hood was on sick leave from October 9–13, October 16–20 and October 23–25. Hood later told an investigator for credit card companies that he had been in Atlanta with Clarence Feagin (a Thevis alias) on October 25, the date of Underhill's death. On October 24, 1978, Hood placed a call from the Journey's End motel in Atlanta to the South Carolina Highway Patrol in order to run a license check on the car being driven by Underhill.

Underhill owned an undeveloped tract of land on Riverside Drive in Atlanta. It had an unpaved driveway, blocked by a gate, which carried visitors quickly out of sight of the main road. At the time of Underhill's death, this property was for sale. On October 24, Evans went to the office of real estate agent Louis Carter, and asked to see the Fulton County tax maps. Evans first looked for a single-family residence on Riverside Drive, but was unable to locate it because she had the wrong address. Next,

Evans asked about the Underhill property, claiming she had a prospective purchaser. Carter considered this request odd, because about a year and a half earlier Carter had contacted Evans about this same property. Evans at that time warned Carter not to have anything to do with the Underhill property, explaining that Underhill was dangerous and "involved with Michael Thevis' activities."

On October 21, 1978, Irene Williams, Underhill's fiancee, joined him at an Atlanta motel. Underhill intended to enter the Federal Witness Protection Program shortly, but wanted to sell the Riverside Drive property first. Ms. Williams and Underhill spent two days cleaning up the property. On Wednesday, October 25, Underhill left Williams at approximately 11:30 a. m. to keep an appointment to show the property to Isaac N. Galanti. At about noon, Williams and her two children drove to meet Underhill. When she arrived, she noticed the gate was down and then found the bodies of Underhill and Galanti. She ran across the street to the residence of Henry and Pearl Stumminger.

On Tuesday night, October 24, Henry Stumminger had observed a car or truck bash into the gate on the driveway of the Underhill property. At 11:35 a. m. on October 25, Mrs. Stumminger heard seven or eight "pops," looked out the window, and saw a black car driving slowly up Riverside Drive. About twenty-five minutes later, a "hysterical" Irene Williams rang her doorbell.

Police and FBI agents were summoned to the scene. They found several shotgun shell casings and spent 30.06 shells. Underhill had died from one or more shotgun blasts. Galanti had been killed by gunshot wounds to the head and neck. One wound on his neck was attributable to a high-powered rifle, such as a 30.06.

At trial the government presented identification testimony from two eyewitnesses: Rodney Letchworth, who placed Thevis at the scene of the Underhill-Galanti shooting, and Milton McMurray, who placed Thevis, Evans, and Hood together approximately

forty-five minutes after the murders. At approximately 11:30 a. m. on October 25, Letchworth, a retired marine pilot, had driven by the Underhill property and noticed a man standing near the gate. He later identified this individual as Thevis. McMurray, a commercial airline pilot, was a neighbor of Evans. At 12:10 p. m. on October 25, and again about 15–20 minutes later, McMurray observed Evans and two men drive past his yard. At trial, he identified the man in the front seat as Thevis, and the man in the back as Hood.

Thevis and Evans were arrested on November 9, 1978 in Bloomfield, Connecticut. A search of their persons and their car yielded firearms, $411,000 in cash, and over one million dollars worth of jewelry. A search of a rental locker in South Windsor, Connecticut disclosed a transcript of interviews the FBI had conducted with Underhill. Fingerprint analysis revealed over 100 of Thevis' fingerprints and palm prints throughout the transcript and one of Evans' fingerprints on an inside page of the transcript.

Immediately after his arrest, Thevis was confined in a federal prison in Danbury, Connecticut. His cellmate, Bernard McCarthy, testified that Thevis had confessed to the murder of Underhill. According to McCarthy, Thevis told him that he had lured Underhill to his property by breaking the fence down, where he "assassinated" Underhill and his "bodyguard" with a shotgun. Thevis explained that he killed Underhill because Underhill intended to testify against him, and that Underhill was to enter the marshal's protection service the following Monday. Thevis boasted to McCarthy that while a fugitive he had travelled incognito in the Atlanta area, once receiving a speeding ticket there. Police later determined, based solely on McCarthy's information, that Thevis had received such a ticket using the name C. M. Feagin. McCarthy was also able to describe the contents of Thevis' car at the time Thevis was arrested.

## II. Challenges to the Indictment

### A. *The Interpretation of RICO*

Appellants make three separate arguments that the trial court erred in construing RICO. First, they claim that the trial court should have struck the Underhill-Galanti murders from Counts One and Two of the indictment (the RICO charges) because the evidence failed to show that Thevis was "associated with" the enterprise at the time of the murders, and because the murders were not acts through which Thevis conducted the affairs of the enterprise.

■■■ This contention is without merit. As this court noted in *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), proof of association with a RICO enterprise may depend wholly on circumstantial evidence. The record in this case contains such evidence. Although Thevis had purportedly sold his interest in the pornography business to his secretary, Laverne Bowden, for $16 million dollars, the note securing the sale was always in default. Thevis, therefore, could foreclose at any time and regain his interest in the business. Rodney Glen Smith, a cellmate of Thevis in 1977, testified that despite the "sale," Thevis stated he still "controlled" his pornography empire; given the terms of the "sale" and the fact Thevis had contacted Ms. Bowden after his escape from jail in 1978, one could infer that Thevis' interest in the success of the pornography enterprise continued until the Underhill murder. The murder itself, moreover, neatly advanced Thevis' interests in the enterprise. The original indictment in the case sought forfeiture of all the assets of Global and Fidelity under RICO forfeiture provisions.[5] The Underhill murder was designed to prevent the government's key witness from testifying at trial, thus imperiling the government's entire RICO case and preventing both RICO criminal convictions and forfeiture. The murder, therefore, protected the integrity of the enterprise. Keeping the enterprise together was inextricably tied to furthering its business; hence the Underhill murder was a proper predicate act under § 1962. *See United States v. Welch*, 656 F.2d 1039, 1060–62 (5th Cir. 1981) (predicate acts only required to have sufficient nexus with enterprise to be properly charged under RICO).

■■■ Appellants' second argument is that the term "enterprise" as used in RICO does not include the specific association charged in this case. The RICO definitions section, 18 U.S.C. § 1961, states that an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or other group of individuals associated in fact although not a legal entity. . . ." Appellants contend that because the indictment described the enterprise as "a group of individuals associated in fact with various corporations," the enterprise alleged did not fall within the literal bounds of the statutory classifications. We reject this claim.

■■■ This specific question is one of first impression. We nevertheless are convinced, as was the trial court, *United States v. Thevis*, 474 F.Supp. 134, 137 (N.D.Ga.1979), that RICO covers the enterprise alleged in this case. Use of the verb "includes" in the statutory definition indicates congressional intent not to limit a RICO enterprise to the specific categories listed; rather, the language "reveals that Congress opted for a far broader definition of the word 'enterprise'." *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 2533–34, 69 L.Ed.2d 246 (1981). *See United States v. Elliott, supra*, at 897 (quoting *United States v. Hawes*, 529 F.2d 472, 479 (5th Cir. 1976)). Moreover, the House report accompanying RICO stated that "enterprise" included "associations in fact, as well as legally recognized associative entities. Thus infiltration *of any associative group by any individual or group* capable of holding a property interest can be reached." House Rep.No.91–1549, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Ad.News 4007, 4032 (emphasis added). Although the term

---

5. 18 U.S.C. § 1963.

"enterprise" may have some limits,[6] the indictment in this case properly alleged an "association in fact" within the scope of § 1961.

■ Appellants' final argument is that RICO was not intended to apply to illegitimate enterprises such as the association alleged here. The Supreme Court has now decided this issue in *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), holding that RICO applies to both illegitimate and legitimate enterprises.

### B. *The Charge Under 18 U.S.C. § 241*

Count Ten of the indictment charged Thevis, Evans and Hood with violating 18 U.S.C. § 241. That section makes criminal a conspiracy "to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States . . . ." The government alleged that Thevis, Evans and Hood had conspired to injure Underhill in the exercise of his right to testify at trial. Appellants urge that this charge failed to state a crime because the right to testify is not one secured by the Constitution or laws of the United States.

■ To support this contention, appellants cite *United States v. Sanges*, 48 F. 78 (5th Cir. 1891), which specifically held that the right to testify was not one secured by the Constitution or laws of the United States. Although ordinarily a panel must adhere to prior decisions of this court, our first duty is to follow the dictates of the United States Supreme Court. We therefore must consider whether the Supreme Court's decision in *In Re Quarles*, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1894), overruled *Sanges sub silentio*.

*Quarles* involved a conspiracy charge under the predecessor statute to § 241. The victim of the conspiracy was assaulted for reporting a violation of the federal tax laws

to a deputy United States Marshal for the Northern District of Georgia. The Court held that the right to report a crime, although not specifically guaranteed by the Constitution, nonetheless "arose out of the creation and establishment by the Constitution itself of a national government, paramount and supreme within its sphere of action." 158 U.S. at 535–36, 15 S.Ct. at 961. The Court concluded, "It is the duty and right . . . of every citizen, *to assist in prosecuting, and in securing the punishment* of any breach of the peace of the United States." *Id.* at 535, 15 S.Ct. at 960–961 (emphasis added).

■ Thus while *Quarles* did not specifically address the right to testify, the language and reasoning encompass such a right. Testifying at trial both "assists the prosecution" and "secures the punishment" of a crime. Moreover, as the Second Circuit noted in *United States v. Pacelli*, 491 F.2d 1108, 1113 (2d Cir.), *cert. denied*, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974) (holding that the right to testify is one guaranteed by federal law):

> Our federal government has a particular interest in assuring a prospective witness that he or she will be free to respond by attending the trial of a federal indictment as a witness without being prevented from doing so by threats, molestation or force. Otherwise, the foundations of federal justice would be undermined.

*See United States v. Smith*, 623 F.2d 627 (9th Cir. 1980); *United States v. Guillette*, 547 F.2d 743 (2d Cir. 1976), *cert. denied*, 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977). *See generally, Kimble v. D.J. McDuffy, Inc.*, 648 F.2d 340 (5th Cir. 1981) (en banc) (interpreting 42 U.S.C. § 1985(2) as providing a cause of action for racial- or class-based interference with testifying at trial). We conclude, therefore, that *Quarles* implicitly overruled *Sanges*, and the Supreme Court's reasoning controls this case. Thus we hold that the right to testify at trial is one secured by the Constitution, and that the

---

**6.** *Cf. United States v. Mandel*, 415 F.2d 997 (D.Md.1976) (State of Maryland not an "enter- prise").

conspiracy charged in the indictment properly stated a federal crime.

## III. The Evidentiary Rulings

### A. *Admission of Underhill's Grand Jury Testimony*

Having determined that the charges in the indictment were proper, we proceed to consider appellants' various evidentiary claims. One of their major contentions is that the trial court erroneously admitted certain transcripts of Underhill's grand jury testimony and FBI interviews as substantive evidence of guilt on the RICO charges.

The government's principal witness in the RICO case against Thevis and Global was to be Thevis' former business associate, Roger Dean Underhill. Following Underhill's murder, the government notified the court and the defendants that pursuant to Fed.R. Evid. 804(b)(5),[7] it intended to offer portions of Underhill's grand jury testimony and interviews with the FBI as substantive evidence of Thevis' guilt under Counts One and Two. The court permitted the government to offer its evidence as to Count Ten first, in order to establish that Thevis was responsible for Underhill's death and provide a basis for the court to rule on the 804(b)(5) issue. The court then admitted specific portions of Underhill's testimony as containing sufficient "circumstantial guarantees of trustworthiness" as required under Fed.R.Evid. 804(b)(5). The court also held that although admitting the evidence under Rule 804(b)(5) would have violated Thevis' confrontation rights under the sixth amendment, the government had estab-

lished by "clear and convincing" evidence that Thevis had caused Underhill's death; hence, Thevis had waived his confrontation rights. *United States v. Thevis*, 84 F.R.D. 57 (N.D.Ga.1979).

In contending that the trial court erred in admitting the Underhill evidence, appellants make three arguments. First, appellants claim that the evidence did not have the "circumstantial guarantees of trustworthiness" required to meet Rule 804(b)(5). Appellants also contend that the trial court erred in applying the "clear and convincing" standard to the proof of Thevis' waiver, arguing instead that the "beyond a reasonable doubt" standard should apply. Finally, appellants argue that even if Thevis waived his confrontation rights, Underhill's statements were so untrustworthy that their admission violated due process.

The issue of admissibility of a witness' hearsay statements in the face of a defendant-caused absence of that witness from trial is a question of first impression in this circuit, although other circuits have faced this problem under slightly different circumstances. In *United States v. Balano*, 618 F.2d 624 (10th Cir. 1979), *cert. denied*, 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980), the Tenth Circuit confronted a situation in which the defendant had coerced the witness into silence by threatening the witness' life. The court held that the defendant had waived his confrontation rights and without further explanation stated that such a waiver was *a fortiori* a waiver of any hearsay objection. In *United States v. West*, 574 F.2d 1131 (4th Cir. 1978), a key

---

**7.** Rule 804(b) deals with exceptions to the hearsay rule for statements made by a declarant who is now unavailable for trial. The exceptions include former testimony, 804(b)(1); dying declarations, 804(b)(2); statements against interest, 804(b)(3); and statements of personal or family history, 804(b)(4). Subsection (b)(5) is the residual exception for the situation in which the declarant is unavailable. This subsection reads as follows:

(5) Other exceptions.—A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the state-

ment is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

government ·witness had been murdered prior to trial, but that murder had not been connected to the defendants. Nevertheless, the Fourth Circuit found that the witness' grand jury testimony met the reliability standards of Rule 804(b)(5) and was sufficiently trustworthy that its admission did not violate the confrontation clause. Finally, *United States v. Carlson*, 547 F.2d 1346 (8th Cir. 1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977), the case the trial court primarily relied on here, involved facts similar to those in *Balano*. After determining that the witness' grand jury testimony met the standards of Rule 804(b)(5), the Eighth Circuit held that, even assuming admitting the evidence would violate the confrontation clause, the defendant had waived his confrontation rights by intimidating the witness into silence.

We reject both the *West* and *Carlson* approaches to this issue, based upon our reading of Rule 804(b)(5) and relevant Supreme Court precedent. As to *Carlson*, we are convinced that Rule 804(b)(5) does not require finding a confrontation clause waiver once a court has concluded that the proffered evidence has met the reliability standards of the Rule. Both the wording of the Rule [8] and the legislative history [9] indicate

8. *See* note 7, *supra*.

9. The Senate Report stated: '

The proposed Rules of Evidence submitted to Congress contained identical provisions in rules 803 and 804 (which set forth the various hearsay exceptions), admitting any hearsay statement not specifically covered by any of the stated exceptions, if the hearsay statement was found to have "comparable circumstantial guarantees of trustworthiness." The House deleted these provisions (proposed rules 803(24) and 804(b)(6)[(5)]) as injecting "too much uncertainty" into the law of evidence and impairing the ability of practitioners to prepare for trial. The House felt that rule 102, which directs the courts to construe the Rules of Evidence so as to promote growth and development, would permit sufficient flexibility to admit hearsay evidence in appropriate cases under various factual situations that might arise.

We disagree with the total rejection of a residual hearsay exception. While we view rule 102 as being intended to provide for a broader construction and interpretation of these rules, we feel that, without a separate residual provision, the specifically enumerated exceptions could become tortured beyond any reasonable circumstances which they were intended to include (even if broadly construed). Moreover, these exceptions, while they reflect the most typical and well recognized exceptions to the hearsay rule, may not encompass every situation in which the reliability and appropriateness of a particular piece of hearsay evidence make clear that it should be heard and considered by the trier of fact.

The committee believes that there are certain exceptional circumstances where evidence which is found by a court to have guarantees of trustworthiness equivalent to or exceeding the guarantees reflected by the presently listed exceptions, and to have a high degree of prolativeness and necessity could properly be admissible.

The case of *Dallas County v. Commercial Union Assoc. Co., Ltd.*, 286 F.2d 388 (5th Cir. 1961) illustrates the point. The issue in that case was whether the tower of the county courthouse collapsed because it was struck by lightning (covered by insurance) or because of structural weakness and deterioration of the structure (not covered). Investigation of the structure revealed the presence of charcoal and charred timbers. In order to show that lightning may not have been the cause of the charring, the insurer offered a copy of a local newspaper published over 50 years earlier containing an unsigned article describing a fire in the courthouse while it was under construction. The Court found that the newspaper did not qualify for admission as a business record or an ancient document and did not fit any other recognized hearsay exception. The court concluded, however, that the article was trustworthy because it was inconceivable that a newspaper reporter in a small town would report a fire in the courthouse if none had occurred. *See also United States v. Barbati*, 284 F.Supp. 409 (E.D.N.Y.1968).

Because exceptional cases like the *Dallas County* case may arise in the future, the committee has decided to reinstate a residual exception for rules 803 and 804(b).

The committee, however, also agrees with those supporters of the House version who felt that an overly broad residual hearsay exception could emasculate the hearsay rule and the recognized exceptions or vitiate the rationale behind codification of the rules.

Therefore, the committee has adopted a residual exception for rules 803 and 804(b) of much narrower scope and applicability than the Supreme Court version. In order to qualify for admission, a hearsay statement not falling within one of the recognized exceptions would have to satisfy at least four conditions. First, it must have "equivalent circumstantial guarantees of trustworthiness." Second, it must be offered as evidence of a material fact. Third, the court must determine that the statement "is

that Congress intended evidence to be admitted under 804(b)(5) only if the reliability of the evidence *equals* or *exceeds* that of the other exceptions in Rule 804(b). The Supreme Court has held that as to two of the other exceptions, dying declarations and prior testimony where cross-examination has already occurred, the reliability of the admitted evidence satisfies the confrontation clause. *See Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 2540–41, 65 L.Ed.2d 597 (1980) (prior testimony); *Mattox v. United States*, 156 U.S. 237, 243–44, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895) (dying declarations). *See also, Pointer v. Texas*, 380 U.S. 400, 407, 85 S.Ct. 1065, 1069–70, 13 L.Ed.2d 923 (1965) (citing *Mattox* for the proposition that the Court has recognized the admissibility of dying declarations despite lack of confrontation). Hence we find that imposing on 804(b)(5) admissibility the additional condition of a waiver of confrontation rights is contrary to the express wording of the Rule, congressional intent, and Supreme Court precedent.[10]

A more fundamental disagreement with both *West* and *Carlson* is the conclusion in those cases that corroborated grand jury

testimony in fact meets the reliability standards of Rule 804(b)(5). The Senate Judiciary Committee's report on the Federal Rules of Evidence stated that the 804(b)(5) residual exception was to be used only rarely, in truly exceptional circumstances.[11] Corroborated grand jury testimony which for one reason or another is unavailable at trial is neither rare nor exceptional, and in our opinion its general admission under this theory would constitute a "major revision" of the hearsay rule that, as the Senate Judiciary Committee admonished, is for the legislature, not the judiciary. Grand jury testimony, although given under oath, is not subjected to the vigorous truth testing of cross-examination, as is prior testimony. Grand jury testimony, moreover, is often given under a grant of immunity which might encourage a witness to "embellish" his story. We need not determine whether grand jury testimony ever meets the stringent reliability standards of Rule 804(b)(5),[12] however, because we conclude other grounds support the admission of the Underhill statements. Thus while we agree with the trial court's application of the "clear and convincing" standard to the ad-

more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." This requirement is intended to insure that only statements which have high probative value and necessity may qualify for admission under the residual exceptions. Fourth, the court must determine that "the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."

It is intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances. The committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and 804(b). The residual exceptions are not meant to authorize major judicial revisions of the hearsay rule, including its present exceptions. Such major revisions are best accomplished by legislative action. It is intended that in any case in which evidence is sought to be admitted under these subsections, the trial judge will exercise no less care, reflection and caution than the courts did under the common law in establishing the now-recognized exceptions to the hearsay rule.

S.Rep. No. 93–1277, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News 7051, 7065–66.

**10.** *See United States v. Ward*, 552 F.2d 1080 (5th Cir.), *cert. denied*, 434 U.S. 850, 98 S.Ct. 161, 54 L.Ed.2d 119 (1977) (admitting in a criminal trial evidence which met the standards of Rule 804(b)(5) without finding a waiver of confrontation rights).

**11.** *See* note 9, *supra*.

**12.** *E. g., compare United States v. Gonzalez*, 559 F.2d 1271 (5th Cir. 1977) (grand jury testimony not admissible under facts of case) *with United States v. Ward*, 552 F.2d 1080 (5th Cir.), *cert. denied*, 434 U.S. 850, 98 S.Ct. 161, 54 L.Ed.2d 119 (1977) (hearsay statements of truck driver to FBI agent admissible where FBI agent had confirmed all the details of the statement and "nothing was uncovered to refute his version of the events"). *See also* the dissent of Justices Stewart and Marshall from the denial of certiorari in *United States v. Garner*, 574 F.2d 1141 (4th Cir.), *cert. denied*, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978) which strongly implies that grand jury testimony may not meet the reliability standards of Rule 804(b)(5).

missibility question, we find the evidence admissible on a different basis than did the trial court: adopting the Tenth Circuit's approach in *Balano*, we hold that Thevis' waiver of his right to confrontation in these circumstances also constituted a waiver of any hearsay objection.

### 1. The Constitutional Waiver

■ The sixth amendment to the Constitution provides in part that "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ...." All parties to this appeal agree that this right may be waived in a proper case. *Brookhart v. Janis*, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966). Whether a waiver existed in this case requires analyzing two separate questions: whether a defendant's murder of a witness for the purpose of preventing his testifying at trial constitutes a valid waiver, and what standard of proof the government must bear in proving that waiver.

■ A waiver of a constitutional right is ordinarily valid only if there is "an intentional relinquishment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). A variety of actions by the accused constitute an express waiver of the right to confrontation. *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) (guilty plea); *United States v. Stephens*, 609 F.2d 230 (5th Cir. 1980) (stipulations to evidence). The accused, however, may also waive his confrontation rights indirectly, such as by absenting himself from trial, *Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973), or engaging in contumacious conduct which requires his removal from the courtroom. *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

■ We conclude that a defendant who causes a witness to be unavailable for trial for the purpose of preventing that witness from testifying also waives his right to confrontation under the *Zerbst* standard. A defendant who undertakes this conduct realizes that the witness is no longer available and cannot be cross-examined. Hence in such a situation the defendant has intelligently and knowingly waived his confrontation rights.

■ The policy interests underlying the confrontation clause, moreover, mandate this result. We recognize that the right of confrontation is so fundamental to our concept of a fair trial that it is a privilege specifically guaranteed by the Constitution. Nevertheless, both *Taylor* and *Allen* indicate that the right is not absolute, and must give way at times to stronger state interests. Similarly, when confrontation becomes impossible due to the actions of the very person who would assert the right, logic dictates that the right has been waived. The law simply cannot countenance a defendant deriving benefits from murdering the chief witness against him. To permit such subversion of a criminal prosecution "would be contrary to public policy, common sense, and the underlying purpose of the confrontation clause," *United States v. Carlson*, 547 F.2d 1346, 1359 (8th Cir. 1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977), and make a mockery of the system of justice that the right was designed to protect.

The question of the proper burden of proof to apply to the waiver question presents a more difficult issue. Appellants claim that the "reasonable doubt" standard should apply, relying in part on the Supreme Court decision *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).[13] As the Court later noted in *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), however, *Winship* "was not concerned with the standards for determining the admissibility of evidence"; rather, *Winship* merely affirmed the necessity for the prosecution, in order to secure a

---

13. In *Winship*, a juvenile was adjudged delinquent on the basis of a preponderance of the evidence that he had committed an act which would constitute a crime if he were an adult. The Supreme Court held that such adjudication must be based on the "reasonable doubt" standard.

conviction, to prove every essential element of the offense beyond a reasonable doubt. Here the trial court's decision to admit Underhill's statements was purely an evidentiary ruling, not a decision on Thevis' substantive guilt. Hence we reject appellants' "reasonable doubt" standard on the basis of the Supreme Court's analysis in *Lego*.

Because of the intimate association between the right to confrontation and the accuracy of the fact-finding process, however, we also reject the government's suggestion that the "preponderance" standard accepted by the Supreme Court in *Lego* (to judge the voluntariness of a confession) and *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (to judge whether a warrantless search was consensual) is also adequate to protect confrontation rights.

The Supreme Court repeatedly has noted the importance of confrontation rights in testing the reliability of evidence. Indeed, the Court in its most recent confrontation clause case declared that the role of confrontation in testing accuracy is so important "that the absence of confrontation at trial calls into question the ultimate integrity of the fact-finding process." *Ohio v. Roberts*, 448 U.S. 56, 64, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 579 (1980) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973) and *Berger v. California*, 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969)). The Court, moreover, has stated that "a primary interest secured by [the confrontation clause] is the right to cross-examination," *Ohio v. Roberts*, *supra* at 63, 100 S.Ct. at 2537 (quoting *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965)), which has been described as "the greatest legal engine ever invented for the discovery of truth." J. Wigmore, Evidence § 1367 (3d ed. 1940). As we have previously noted:

[T]he right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the "accuracy of the truth-determining process." It is, indeed, "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal."

*Smith v. Estelle*, 569 F.2d 944, 946 (5th Cir. 1978) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (citations omitted)).

Where reliability of evidence is a primary concern, the Supreme Court has conditioned admissibility on the "clear and convincing" standard. The prosecution, for example, must prove by clear and convincing evidence that an in-court identification that follows a tainted identification has a reliable independent basis before the identification can be admitted into evidence. *United States v. Wade*, 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967); *Cannon v. Alabama*, 558 F.2d 1211, 1218 (5th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). In contrast, judicial determinations of the admissibility of evidence under the exclusionary rule normally do not relate to the reliability of the evidence, but instead are aimed at deterring police misconduct. *Stone v. Powell*, 428 U.S. 465, 486–87, 96 S.Ct. 3037, 3048–49, 49 L.Ed.2d 1067 (1976); *United States v. Brookins*, 614 F.2d 1037, 1046–47 (5th Cir. 1980). *See Lego v. Twomey*, 404 U.S. 477, 484–85 & nn. 12 & 13, 92 S.Ct. 619, 624–25 & nn. 12 & 13, 30 L.Ed.2d 618 (1976) (purpose of voluntariness hearing is not to decide reliability of confession).[14] Thus because confrontation rights are so integral to the accuracy of the fact-finding process and the search for truth, in contrast to the exclusionary rule, we conclude that the trial court was correct in requiring clear and convincing evidence of a waiver of this right.

---

14. In *Brookins* this court noted that reliability of evidence played a secondary role in fifth and sixth amendment suppression hearings. Nevertheless, once a confession, for example, is found "voluntary" and admitted, the defendant may still cross-examine various witnesses concerning the credibility of that confession at trial. In contrast, the loss of confrontation rights precludes cross-examination, although we note that in this case the defendants did introduce evidence to impeach Underhill.

## 2. Waiver of the Hearsay Objection

In *United States v. Balano*, 618 F.2d 624 (10th Cir.), *cert. denied*, 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980), the Tenth Circuit faced a situation in which the defendant had coerced the witness into silence. The court stated that waiver of one's right to confrontation was *a fortiori* a waiver of one's right to raise a hearsay objection. *Id.* at 626. We agree, basing our decision on an analysis of the interests served by both the confrontation clause and hearsay rule.

 Although the Supreme Court explicitly has held that the confrontation clause and the hearsay rule are not coterminous, *California v. Green*, 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–34, 26 L.Ed.2d 489 (1976), the Court recently has stated that it is a "truism" that both provisions protect the same values. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Both the confrontation clause and the hearsay rule seek to balance the need for relevant, probative evidence against the defendant's interest in testing the accuracy of evidence through personal confrontation and cross-examination.[15] *See id. Cf.* Fed. R.Evid. Advisory Committee's Note on the Hearsay Problem, *quoted in* 4 J. Weinstein, Evidence 800–02 to 800–08 (1979). As noted by the Supreme Court in *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 339, 39 L.Ed.2d 409 (1895), the confrontation clause envisions:

"a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

Similarly, the hearsay rule envisions testimonial evidence given under the ideal conditions of a witness under oath, in the personal presence of the trier of fact, and subject to cross-examination. Advisory Committee Note, *supra* at 800–02. The reason that the hearsay rule and confrontation clause are not coterminous is not because the two provisions protect different interests, but because the two may balance the relevant interests differently. Thus a particular hearsay rule may admit evidence which offends confrontation rights because the rule favors the need for evidence and its probable reliability over the defendant's confrontational rights. Conversely, a particular hearsay rule may restrict evidence which nevertheless satisfies the confrontation clause because the rule favors increased protection for the defendant. *California v. Green*, 399 U.S. 149, 156, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970). *See Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).[16] In either case, however, the key interest offsetting the need for evidence is the defendant's interest in confrontation; if this interest is removed

15. Of course, an incidental interest served by the hearsay rule to the extent it excludes unreliable evidence is the integrity of the fact-finding process. Nevertheless, this interest is counterbalanced by a concern that in the adversary process each side must develop his own case. If integrity of the judicial process were the overriding concern with hearsay, we would not permit one to waive the hearsay objection at trial by failing to raise it.

16. In *Barber* the prosecution introduced at trial in Oklahoma state court a transcript of the testimony of a witness given at a preliminary hearing. The defendant was represented by counsel at the hearing, but counsel did not cross-examine the witness. At the time of trial, the witness was incarcerated in a Texas

federal prison and the trial court concluded that his absence from the jurisdiction made the witness "unavailable" under an Oklahoma hearsay rule exception; the court then admitted the transcript. The Supreme Court reversed, holding that admitting the transcript violated the defendant's confrontation rights because the witness was not truly "unavailable."

We have not found a case dealing with the situation in which a hearsay rule offers a criminal defendant greater protection than the confrontation clause. This is not unusual in light of the fact that a criminal defendant who loses at trial would not assert as grounds for appeal that the hearsay rule should have offered him less protection.

by a waiver of confrontation rights, the balance must necessarily fall in favor of the need for evidence. We hold, therefore, that under the circumstances of this case, Thevis' waiver of his confrontation rights also acted as a waiver of the right to raise a hearsay objection once the prosecution demonstrated a need for the evidence.[17]

### 3. The Due Process Objection

■■■ We also reject appellants' contention that admitting the Underhill testimony, even if otherwise proper, violated due process by permitting a conviction based on unreliable evidence. While a case may exist in which the evidentiary base is so totally lacking in reliability that a conviction would violate due process, *California v. Green*, 399 U.S. 149, 163 n.15, 90 S.Ct. 1930, 1938 n.15, 26 L.Ed.2d 489 (1970), this is not such a case. Other evidence sufficiently corroborated Underhill's testimony that the trial court concluded that the statements met the stringent reliability standards of Fed.R.Evid. 804(b)(5).[18] While we do not decide if the trial court correctly ruled on the 804(b)(5) issue, we find that the corroborative evidence indicated that Underhill's statements were not "totally lacking" in reliability, and that a conviction based upon

this evidence did not violate appellants' due process rights.

### B. *Claims Under Rule 403*

Appellants raise several points which relate to trial court rulings under Fed.R.Evid. 403. Because all these points involve the same legal principles and standard of review, we will discuss them together.

### 1. The Standard of Review

■■■■ Under Fed.R.Evid. 403, a trial judge may exclude relevant evidence if he finds that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant from admitting the evidence. Nevertheless, because it permits a trial court to exclude concededly probative evidence, Rule 403 is an extraordinary remedy which should be used sparingly. As this court noted in *United States v. McRae*, 593 F.2d 700 (5th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979):

> Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to

---

**17.** We wish to emphasize that our resolution of the admissibility of Underhill's grand jury testimony does not permit wholesale admission of hearsay evidence when a witness is unavailable. Under the approach we adopt, a hearsay statement of a potential witness is admissible only if the government shows, by clear and convincing evidence, that (1) the defendant caused the witness' unavailability (2) for the purpose of preventing that witness from testifying at trial. Thus hearsay evidence would not be admissible simply because the witness was missing. Moreover, even if the government proved by clear and convincing evidence that the defendant had caused the witness' absence, the hearsay evidence would still not be admissible until the government proved the second part of the test, i. e., that the defendant-caused absence was for the purpose of preventing the witness from testifying. In addition, the "clear and convincing" standard of proof dictates that close cases must be resolved in favor of the defendant. Here, however, the trial court specifically found clear and convincing evidence showing that to prevent Underhill from testifying at trial "Thevis and others including defendants Evans and Hood conspired

to murder Underhill, and on October 25, 1978, the objective of the conspiracy was successfully attained." *United States v. Thevis*, 84 F.R.D. 57, 73 (N.D.Ga.1977).

Even when the government meets this two-part test, the trial court should scrutinize the proffered statements to ensure that the evidence is not unreliable. If the evidence appears unreliable, its probative value may well be outweighed by the unfair prejudice resulting from unreliability and should be excluded under rule 403. Moreover, admission of totally unreliable evidence may raise due process objections. *See* discussion *infra*. We note that in this case, however, sufficient indicia of reliability existed to avoid rule 403 or due process problems. *See* Part III A 3 of this opinion, *infra*, and the summary of corroborative evidence in *United States v. Thevis, supra*, at 66–68.

**18.** This corroborative evidence is explained in detail in the trial court's opinion dealing with the admission of the Underhill statements. *United States v. Thevis*, 84 F.R.D. 57, 66–68 (N.D.Ga.1979).

be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. As to such, Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance.

593 F.2d at 707 (emphasis original). In making this decision, the trial court has broad discretion which is reviewable only for abuse. *Ramos v. Liberty Mutual Ins. Co.*, 615 F.2d 334, 340 (5th Cir. 1980), *cert. denied, Rucker Company v. Shell Oil Company*, 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981); *United States v. McRae, supra; Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1347 (5th Cir. 1978). With this standard as background, we proceed to assess appellants' numerous claims of error.

2. Exhibit 47

As part of its proof of Count Ten the government introduced a transcript of interviews of Underhill taken by FBI agents in January 1977, shortly after Underhill received immunity and agreed to cooperate with the government in its investigation of Thevis. In these interviews, Underhill accused Thevis of plotting several murders and committing numerous assaults, bombings, extortions and arsons. In addition to accusations of specific crimes, Underhill repeatedly speculated that Thevis had Mafia connections and had tried or would try to have him killed.

In June 1978, the grand jury returned its first RICO indictment against Thevis. As part of pre-trial discovery for the corporate defendants, and in preparation for a deposition of Underhill, the government provided to defense counsel a 363-page copy of Underhill's tape-recorded FBI interviews. After Thevis was arrested in November 1978 in Connecticut, a search of a nearby rental locker revealed a copy of the Underhill interview. Thevis' fingerprints appeared on pages throughout the transcript, and one of Evans' fingerprints was found on an inside page. At trial the government sought to introduce a copy of the Underhill transcript, exhibit 47, as evidence that Thevis knew Underhill was cooperating with the government and therefore had a motive to kill Underhill to prevent him from testifying. Defense counsel objected to the admission of exhibit 47 on the basis of Rule 403. The defense, moreover, offered to stipulate that Thevis knew Underhill was cooperating with the government, thereby rendering admission of exhibit 47 unnecessary. The court rejected defendants' offer to stipulate and ruled that the exhibit was admissible to show Thevis' knowledge and motive. In order to avoid the risk that the jury would misuse the evidence, the court gave limiting instructions, both at the time of admission and in the final instructions, that the jury could not consider the exhibit for the truth of its contents; rather, it could only consider the exhibit as it bore upon the motives of those who had knowledge of its contents.

Appellants argue that these limiting instructions were ineffective and forced the jury to perform "mental gymnastics." They assert that the allegations of other crimes and "bad acts" in the interviews were so damning that no jury could have ignored them. Moreover, they contend that their admission was unnecessary in view of the defense offer to stipulate to Thevis' knowledge that Underhill was a government witness. While appellants concede that exhibit 47 was probative as to Thevis' knowledge, they vigorously contend that the nature of the statements in the transcript unfairly prejudiced the jury against Thevis, and that this prejudice substantially outweighed any probative value.

We disagree. Count Ten alleged that Thevis had conspired to murder Underhill in order to prevent his testifying in the upcoming trial. Government exhibit 47 was highly probative in establishing that Thevis had a motive to kill Underhill. The transcript did more than merely indicate that Underhill was cooperating, perhaps grudgingly, with the government in the Thevis investigation; the sweeping nature

of the accusations demonstrated that Underhill was willing to "tell all" to the government. Although the potential for unfair prejudice certainly existed, the probative value of the exhibit was at least equally strong.

█ Nor do we find that the defense offer to stipulate to Thevis' knowledge of Underhill's cooperation with the government obviated the government's need for this evidence. Had a stipulation carried similar probative weight as the proffered evidence, the potential for unfair prejudice may have warranted exclusion of the exhibit. As noted above, however, the transcript revealed more than the bare fact that Underhill had agreed to cooperate; it indicated that Underhill was furnishing total and voluntary cooperation. At issue was the effect of Underhill's cooperation on the mind of Thevis; the transcript revealed the extent of Underhill's "doublecross" and provided an explanation for why Thevis chose to murder Underhill to prevent his testifying rather than some less drastic action. The stipulation could not have carried the same force in proving motive. As we previously have said:

> A piece of evidence can have probative value even in the event of an offer to stipulate to the issue on which the evidence is offered. A cold stipulation can deprive a party "of the legitimate moral force of his evidence," 9 Wigmore on Evidence § 2591 at 589 (3rd ed. 1940), and can never fully substitute for tangible, physical evidence or the testimony of witnesses. In most cases, a party has the right "to present to the jury a picture of the events relied upon."

*United States v. Grassi*, 602 F.2d 1192, 1197 (5th Cir. 1979), *vacated on other grounds*, 448 U.S. 902, 100 S.Ct. 3041, 65 L.Ed.2d 1131 (1980), *on remand*, 626 F.2d 444 (5th Cir. 1980) (quoting *Parr v. United States*, 255

F.2d 86, 88 (5th Cir.), *cert. denied*, 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64 (1958)). Accordingly, we will not disturb the trial court's discretionary decision that the prejudicial impact of the decision did not substantially outweigh its probative value.

█ Finally, we do not agree with appellants that the limiting instructions necessarily confused the jury. All parties concede that Underhill's statements were hearsay and could not be considered for their truth. Nevertheless, the statements were admissible as evidence of Thevis' knowledge of Underhill's cooperation. *See, e. g., United States v. Parry*, 649 F.2d 292 (5th Cir. 1981); *United States v. Bankston*, 603 F.2d 528 (5th Cir. 1979).

The court carefully instructed the jury when exhibit 47 was introduced that the statements in the transcript were "absolute hearsay" and could not be considered for any purpose other than motive. The court's explanation of this distinction was a correct statement of the law, and rendered the distinction easily understandable to the jury. *See United States v. Parry, supra*, at 295; *United States v. Wyatt*, 611 F.2d 568, 569 (5th Cir. 1980).

### 3. The "Shoe-Mike" Evidence

In June 1977 Underhill visited Thevis in prison in Springfield, Missouri, ostensibly to discuss settlement of Underhill's pending civil RICO suit against Thevis. Unknown to Thevis, Underhill carried a small transmitter in the heel of his shoe, permitting FBI agents to monitor and tape the conversation. At one point Underhill told Thevis that he had taken a polygraph test to corroborate his story concerning the Mayes and Hanna murders, had implicated Thevis in the murders, and had "passed with flying colors." Thevis responded, "No wonder you passed." [19]

---

**19.** The relevant part of the conversation was as follows:

Underhill: [RDU] I won't say too much right now, Mike, look, let me show you something. I got problems. Now, look, when I took the test for the FBI, what agent was there, uh, King was there and

FBI polygraph examiner was there, and Roger Thompson was there ... and he looked at the question and struck a couple
. . .
Thevis: [MGT] What did you take a polygraph test on?

Over strong objections by defense counsel, the trial court admitted this conversation only as evidence showing Thevis knew Underhill was cooperating with the government, and sternly instructed the jury on the legal position of polygraph evidence.[20] The court repeated the limiting instruction in its final charge to the jury. Despite these limiting instructions, appellants contend that the probative value of the evidence

> RDU: They asked me if I killed Jimmy Mayes. And they asked me if I killed Ken Hanna and if I put his body in the car and if I saw him alive that day. I said no, no no.
> MGT: Well didn't they also ask you if you had any knowledge of it or et cetera, et cetera?
> RDU: Yeah.
> MGT: How did you do?
> RDU: I didn't tell any lies and they said I passed the test with flying colors. One thing they asked me, they said that, uh, that, that, now see I had the privilege.
> MGT: You didn't tell any lies.
> RDU: No sir, but I had the privilege. Roger Thompson says you had the privilege. Nothing can be used in, uh, out of this, out of this thing against anybody, and some of the things that (cough) they asked me if, if I know who killed Ken, Ken Hanna.
> MGT: Yeah, . . .
> RDU: Somebody tell you who killed him, I said yes.
> MGT: You said yes, you know?
> RDU: I said yes, I know, because I, I told Roger Thompson . . . I'd tell the truth, you know. So anyway, they couldn't use this thing to bring me before the grand jury.
> MGT: But they didn't ask you any further things like . . .
> RDU: Like, uh, now Roger Thompson struck a lot of this off?
> MGT: They didn't ask you any further things if you were an accomplice in it . . . or if you helped in any way?
> RDU: They asked if I had knowledge. They asked me if I had built a bomb. I said no. That killed Jimmy Mayes. They asked me if I saw the bomb. I said no. They asked me if I was downtown or saw Mayes the night that he was killed. I said no.
> MGT: Well, what'd they, what'd they, what'd you tell'em when they asked you if I did it?
> RDU: I said yes.
> MGT: Well, you mean you . . .
> RDU: You wouldn't want me to lie.
> MGT: No wonder you passed.
> RDU: You expect me to tell the truth.
> MGT: No wonder you passed. I believe it.
> RDU: I'd passed the test with flying colors. They told Thompson . . .

20. THE COURT: Ladies and gentlemen, when you were about to hear these tapes, the Court gave you a limiting instruction as to how to view the tapes and the transcript. The tapes which you have just heard and the transcripts which were admitted for the limited purpose for which I have described its admission include a reference to a polygraph examination taken by Roger Underhill. You are not to draw any inference from the statement that Robert—you are not to draw any inference from any statement about any polygraph examination that Roger Underhill's testimony is any more credible than any other witness, for under the law, the results of a polygraph or lie detector test are considered to be scientifically unreliable evidence and inadmissible for that very purpose.

I know of no court in which the results of a polygraph test will be admitted for the purpose of showing any scientific results thereof. The references to the test are not to be considered by you in any manner which might bolster the credibility of Roger Underhill. The statement as to the polygraph test or lie detector test as it is sometimes called was admitted for the extremely limited purpose of showing, if it does, that Underhill had cooperated or was cooperating with the government, and that Underhill told the defendant, Mr. Thevis, of this cooperation in the manner related with reference to his statements about a polygraph test.

Whether or not this is true is a question of fact for you to resolve. This evidence is not admitted for any other purpose, and except for the limited purpose I have outlined, it has no probative value at all. It is, of course, not admitted against anyone in the case but Mr. Thevis.

Now, in addition to that, the conversations purported to be on these tapes between Mr. Thevis and Mr. Underhill contain numerous statements by one or the other as to what some person has said to one or the other of them. I instruct you that when an individual relates what someone else has said to him, it is hearsay and has no probative bearing. And, this tape, as I have indicated, is admissible only for the purpose of showing, if it does, cooperation by Mr. Underhill with the Government and showing, if it does, knowledge on the part of Mr. Thevis that Mr. Underhill was cooperating with the Government, if it does show that.

Any references to polygraph examinations have no merit, no bearing, and no evidentiary value in the case except to show, if they do, what one individual may have told the other as to his cooperation with the Government. I reiterate that a polygraph test is completely without admissibility as to its results, and would not be admitted into evidence in any court that I know of for the results thereof.

was far outweighed by the unfair prejudice to Thevis evoked by Underhill's references to the polygraph test, especially in light of the prior admission of exhibit 47 as motive evidence. Therefore, appellants claim the trial court committed reversible error by not excluding the evidence under Rule 403.

■ We reject appellants' argument. While they are correct in conceding that exhibit 47 provided the jury with strong motive evidence, that exhibit required the jury to infer Thevis' knowledge from the fingerprints on the exhibit. In contrast, the "shoe-mike" conversation was direct evidence that Thevis knew Underhill was cooperating with the government fully and voluntarily, and thus the conversation was highly probative in its own right. As to the danger of unfair prejudice, we are especially sensitive to the possibility of prejudice arising from courtroom references to polygraph tests. As a result, this circuit has ruled that polygraph results are inadmissible as substantive evidence. *E. g., United States v. Masri*, 547 F.2d 932, 936 (5th Cir.), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977); *United States v. Cochran*, 499 F.2d 380, 393 (5th Cir. 1974), *cert. denied*, 419 U.S. 1124, 95 S.Ct. 810, 42 L.Ed.2d 825 (1975). Nevertheless, we note that here the reference to Underhill's polygraph was not admitted for its truth, but as evidence that Thevis knew Underhill was cooperating with the government. Given the very high probative value of this evidence and the strong limiting instructions, we are unable to say that the danger of unfair prejudice *substantially* outweighed the conversation's probative value. We therefore find no abuse of discretion in admitting the evidence.[21]

### 4. Statements Concerning the Witness Protection Program

■ The trial court also permitted the government to introduce testimony that Underhill had feared Thevis would kill him

and was preparing to enter the government's witness protection program. The court limited the jury's consideration of this evidence to explaining both Underhill's actions before his death and the government's failure to depose him. The court also instructed the jury in its final charges "to draw no inferences unfavorable to the defendants from the fact that government witnesses had been placed in the witness protection plan." Appellants contend that the probative value of this evidence is substantially outweighed by the unfair prejudice which could result from the jury inferring that because government officials placed Underhill in the witness protection program, his fear Thevis might kill him must have been true.

Although we agree with this court's statement in *United States v. Partin*, 552 F.2d 621, 644–45 (5th Cir.), *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1979), that references to the witness protection program "must be handled delicately" and that the prosecution should not be permitted to exploit any prejudice, we again find that the probative value of this evidence was relatively high. It provided explanations for the government's failure to depose Underhill as well as a context for the jury to interpret Underhill's actions prior to his death. Nor do we find that the prosecution took unfair advantage of the references to the program. The trial court's limiting instruction, moreover, reduced the risk of unfair prejudice. We find no abuse of discretion in the admission of this evidence.

### 5. Exclusion of the Frame-Up Evidence

■ One of the theories of the defense at trial was that the FBI had conspired to frame Thevis by suborning perjury and false evidence. William O. Rhodes testified that Underhill and FBI agent Paul King had collaborated to procure Rhodes' false testimony in the separate trial of Gilbert Deitch, a lawyer who had worked for Thev-

---

**21.** We note that Thevis' statements also could be considered party admissions, excepted from the hearsay rule under Fed.R.Evid. 801(d)(2). The trial court, however, ruled the conversation

was not a party admission, and because we have upheld the trial court's theory of admissibility, we need not decide if the conversation in fact constituted a party admission.

is.[22] Robert Frazier, a deputy United States Marshal, testified that Underhill had said King was trying to get him to lie to frame Thevis. To bolster its spoilation theory, the defense offered the testimony of John Reynolds, the FBI polygraph examiner, that Rhodes had failed polygraph examinations relating to his allegedly procured anti-Thevis testimony; the defense also offered Rhodes' own testimony, as well as that of Reynolds, that agent King was aware of these failures. In addition, the defense offered the testimony of Michael Clutter, an attorney who also had worked for Thevis, to corroborate Rhodes' charge that Deitch had been tried on perjured testimony with the knowledge of government officials. The trial court excluded Clutter's and Reynolds' testimony, and that part of Rhodes' testimony relating to the polygraph examination. The court concluded that because the probative value of the evidence was slight, while the risk of prejudice and jury confusion was high, Fed.R.Evid. 403 mandated exclusion. Appellants contend this ruling constituted reversible error.

We disagree. In contrast to the government proffers discussed above, which were highly probative of key facts, the defense offer concerned the conduct of government officials in a wholly separate trial. Rhodes' testimony was admissible only because it tended to impeach Underhill and agent King. Thus the proffered evidence was marginally probative as tending to substantiate Rhodes' credibility, but did not directly attack the evidence offered in this trial. On the other hand, the danger of prejudice and confusion of the jury was relatively high. Although the polygraph evidence was offered ostensibly to show knowledge on the part of agent King, its relevance to the frame-up theory was almost inextricably tied to the reliability of polygraph results as substantive evidence. The danger was great that the jury would have inferred

agent King participated in a frame-up because he knew about the polygraph results which by themselves accurately showed Rhodes lying, rather than because King merely believed Rhodes was lying. Thus the danger was substantial that the jury would rely on the polygraph results for their truth, rather than only as evidence of King's state of mind. Clutter's testimony, moreover, related to an entirely different trial, and did not substantiate Rhodes' charge that the government was offering perjured testimony in this case. Against this background we cannot say that the trial judge abused his discretion in excluding the proffered testimony.

### C. Other Evidentiary Rulings

#### 1. Use Immunity for Defense Witnesses

Appellants filed a pre-trial motion seeking judicial use immunity for George Thevis,[23] father of appellant Michael Thevis. They advised the court that George Thevis' testimony was crucial to the defense, but that he would invoke the fifth amendment if called to testify. The court permitted the defense to proffer George Thevis' expected testimony *in camera, ex parte.* As summarized by the appellants:

> George Thevis would have testified that he was with Thevis and Hood on October 25, 1978, from 11:00 a. m. to 11:40 a. m., at the Journey's End Motel. Hood and George Thevis then left Thevis for about twenty minutes. Appellant Thevis was still at the motel when they returned. The three of them stayed together until about 1:00 p. m. George Thevis refused to testify because of potential prosecution for "harboring" his son, who was then an escaped prisoner.

The trial court held that it lacked authority to grant immunity to any witness. Before this court, appellants concede that the court lacked statutory authority to grant immuni-

---

**22.** Deitch was charged along with Thevis and others in the original indictment. His trial was severed, and he was acquitted.

**23.** Thevis' pre-trial motion requested immunity for several witnesses in addition to George Thevis. On appeal, however, appellants con-

test only the denial of immunity to George Thevis. Appellants, moreover, have abandoned all theories of immunity raised at trial (including a Sixth Amendment compulsory process argument) other than the due process argument.

ty, *see United States v. Smith*, 436 F.2d 787 (5th Cir.), *cert. denied*, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971); they contend, however, that a defendant's due process right to a fair trial gives trial courts inherent authority to confer use immunity. Appellants' due process argument subdivides into two parts. First they claim that because George Thevis' testimony was exculpatory and unavailable from any other source, due process requires immunity to preserve the integrity of the truth-finding function. Second they urge that the government's granting immunity to its witnesses while denying immunity to George Thevis skewed the evidence against appellants and denied them a fair trial.

The Supreme Court has not decided whether courts may grant defense witnesses use immunity, and the circuit courts which have addressed the issue have produced widely divergent opinions. On the question whether judicial use immunity is necessary for essential exculpatory testimony, the courts have split three ways. The Third Circuit, in *Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980) held that such immunity is available in certain circumstances.[24] On the other hand, the Seventh, Eighth and District of Columbia Circuits have held that such immunity is unavailable. *In re Daley*, 549 F.2d 469, 479 (7th Cir. 1976), *cert. denied*, 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977); *United States v. Graham*, 548 F.2d 1302, 1315 (8th Cir. 1976); *United States v. Smith*, 542 F.2d 711, 715 (7th Cir. 1976); *Earl v. United States*, 361 F.2d 531, 534–35 (D.C.Cir.1966),

cert. denied, 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967) (dealing with transactional immunity). The remaining circuits which have addressed the issue have denied immunity in the specific cases before them, but left open whether immunity would ever be available. *United States v. Turkish*, 623 F.2d 769, 771–79 (2d Cir. 1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981); *United States v. Lenz*, 616 F.2d 960, 962–64 (6th Cir.), *cert. denied*, 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980); *United States v. Klauber*, 611 F.2d 512, 517–20 (4th Cir. 1979), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980); *United States v. Alessio*, 528 F.2d 1079, 1081–82 (9th Cir.), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976).

The Fifth Circuit has not explicitly determined whether due process may require a court to grant a defense witness use immunity.[25] We conclude, however, after reviewing the various circuit opinions and conflicting policy arguments, that district courts may not grant immunity to defense witnesses simply because that witness has essential exculpatory information unavailable from other sources. As noted by the Second Circuit in *Turkish, supra*, the two major arguments against granting such judicial use immunity are that the immunity decision would carry the courts into policy assessments which are the traditional domain of the executive branch, and that the immunity would be subject to abuse.

We find these arguments persuasive, and agree that the immunity decision requires a

---

24. In *Smith*, the defendant requested immunity for an exculpatory witness who was under the jurisdiction of the juvenile authorities of the Virgin Islands Attorney General. That office offered the witness immunity on the condition (prompted by prosecutorial courtesy) that the United States Attorney consent. For unexplained reasons, this consent was refused. The Third Circuit held that judicial use immunity was available when: (1) immunity was properly sought in the district court; (2) the witness is available to testify; (3) the proffered testimony is both essential and clearly exculpatory; and (4) no strong governmental interests countervail against an immunity grant.

25. No Fifth Circuit case has upheld a grant of immunity by a trial court, and our cases have strongly suggested, without specifically deciding, that courts lack such power under any circumstances. E. g., *United States v. Herbst*, 641 F.2d 1161 (5th Cir. 1981); *United States v. D'Apice*, 664 F.2d 75 (5th Cir. 1981). *D'Apice* specifically did not rule on whether the due process rights of a defendant might compel court-granted use immunity, but did hold that courts otherwise have no inherent power to grant immunity. *Herbst* involved constitutional claims, but the court held that in absence of a specific proffer of the testimony for which the immunity was requested, the record was insufficient to reach the constitutional issues.

balancing of public interests which should be left to the executive branch. While a grant of use immunity theoretically does not improve the legal position of the person immunized, in that he still can be prosecuted for his crime, in practice the burden placed on the government to prove that any evidence obtained against the immunized suspect is not tainted by the suspect's statement can significantly impair future prosecutions.[26] As the Second Circuit observed, "[C]onfronting the prosecutor with a choice between terminating prosecution of the defendant or jeopardizing prosecution of the witness is not a task congenial to the judicial function." *Turkish, supra*, at 776. *See id.* at 779 (Lumbard, J., concurring in part and dissenting in part). An immunity decision, moreover, would require a trial judge, in order to properly assess the possible harm to public interests of an immunity grant, to examine pre-trial all the facts and circumstances surrounding the government's investigation of the case. Such collateral inquiries would necessitate a significant expenditure of judicial energy, possibly to the detriment of the judicial process overall, and would risk jeopardizing the impartiality and objectivity of the judge at trial. *Id.*

Nor are we convinced that any safeguards imposed on the grant of judicial use immunity adequately reduces the risk of abuse by co-defendants, co-conspirators, friends, or employees.[27] Whatever may be gained in fairness in a particular trial in which true exculpatory evidence may be obtained only through judicial use immunity, therefore, may well be lost through the subsequent effect of abuse on the integrity of the judicial process as a whole. Finally, we note that the fifth amendment privilege is not the only one which may suppress probative evidence from the judicial process; crucial facts, for example, also may be shielded from disclosure by the attorney-client or doctor-patient privilege. Although abrogating the fifth amendment privilege through general use immunity for exculpatory testimony may conflict less with important public interests than abrogating these other privileges, we conclude that the potential interference is nevertheless great enough that the legislature, rather than the courts, should decide on such a course.

Appellants' second argument, that governmental abuse of the immunity process might warrant judicially-compelled use immunity, presents a more compelling case. Some of the courts rejecting a general due-process-based use immunity for exculpatory testimony have nevertheless indicated that governmental abuse might present a different situation. *E. g., Klauber, supra*, at 517–19 (distinguishing abuse cases); *Earl, supra*, at 534 n.1. Two federal cases which granted immunity, moreover, arguably involved abuse situations. *United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976) (government, after previously showing no interest in prosecuting potential witness, threatened prosecution after witness decided to testify for defendant); *United States v. De Palma*, 476 F.Supp. 775 (S.D.N.Y. 1979) (government's choosing among potential defendants, granting immunity to two for their testimony against a third). Finally, Supreme Court precedent supports the

**26.** *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) held that the government has a "heavy burden" to prove that its evidence has not been tainted by the immunized testimony. If the criminal investigation is complete prior to the immunity grant, then immunity raises few problems. In the common situation in which the investigation is continuing, however, immunity may significantly interfere with the presentation of crucial evidence obtained after the immunity grant unless the prosecution takes such extraordinary steps as to arrange for a new team of prosecutors, totally unfamiliar with the case, to continue the investigation. For smaller prosecutors' offices, such measures may be impossible given the staff and financial resources available.

**27.** The incentive for abuse is strong given that the witness, because of immunity, is in no worse a legal position for having testified, and because of the heavy burden on the government to prove lack of taint, the witness in practice may improve his legal position.

Nor are we convinced that perjury prosecutions are an adequate deterrent. Successful perjury prosecutions are not common, and in many cases the penalty for the substantive crime will far surpass perjury penalties.

proposition that the government cannot so abuse its discretion as to render the trial unfair. *E. g., Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (government has a general duty to disclose exculpatory evidence).

 We, however, need not decide in this case if a court may grant immunity when it finds government abuse,[28] because we conclude that no abuse occurred in the prosecution of Michael Thevis. George Thevis' testimony was offered to prove a specific point at issue in the trial: whether Michael Thevis and Bart Hood were present at the scene of the Underhill-Galanti murders. The government evidence placing Thevis and Hood at the scene consisted entirely of non-immunized testimony;[29] hence, no abuse occurred. We conclude, therefore, that under the circumstances, the trial court did not err in refusing to grant George Thevis use immunity.

## 2. The Buckhout Testimony

 At trial the government offered the testimony of two experienced airplane pilots who identified Thevis and Hood as men they had seen at Underhill's property around the time Underhill and Galanti were murdered. The defense attempted to counter this evidence through the testimony of Dr. Robert Buckhout, an expert on the subject of eyewitness identification. Specifically, Buckhout offered to testify that the ability of airplane pilots to make eyewitness identifications is not greater than that of other persons. The trial court excluded the proffered testimony, concluding that the subjects of perception, memory, and identification were within the expertise of the jury and therefore the probative value of the evidence was substantially outweighed by the possibility of prejudice emanating

from this "expert" testimony. Appellants claim this ruling was error.

Rule 702, Fed.R.Evid., permits expert testimony when the trial court determines that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. . . ." As with all evidentiary rulings, the admission of such testimony is addressed to the sound discretion of the trial court. *United States v. Lopez*, 543 F.2d 1156 (5th Cir. 1976). We find no abuse of discretion in the trial court's ruling. Buckhout did not comment specifically on the identification made by the two government witnesses, but instead testified generally as to problems with eyewitness identification and that pilots *as a group* were not better equipped than ordinary witnesses to make identifications. To admit such testimony in effect would permit the proponent's witness to comment on the weight and credibility of opponents' witnesses and open the door to a barrage of marginally relevant psychological evidence. Moreover, we conclude, as did the trial judge, that the problems of perception and memory can be adequately addressed in cross-examination and that the jury can adequately weigh these problems through common-sense evaluation. Our conclusion is supported by other circuits' uniform approval of excluding testimony exactly like Buckhout's. *United States v. Fosher*, 590 F.2d 381, 382–84 (1st Cir. 1979) (Buckhout's specific testimony excluded); *United States v. Watson*, 587 F.2d 365, 368–69 (7th Cir. 1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979); *United States v. Brown*, 540 F.2d 1048, 1053–54 (10th Cir. 1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977); *United States v. Brown*, 501 F.2d 146 (9th Cir. 1974), *rev'd on other grounds sub nom. United States v. Nobles*, 422 U.S.

---

**28.** Although we need not decide today exactly what circumstances might constitute government abuse of the immunity process, we caution that a trial is not a "symmetrical proceeding" which requires a court to grant the defendant's witnesses immunity because the government uses immunized witnesses. *See United States v. Turkish*, 623 F.2d 769, 774–75 (2d Cir. 1980).

**29.** The government presented the eye-witness testimony of two plane pilots placing Thevis and Hood at the scene, as well as the testimony of Thevis' former cellmate that Thevis had confessed to the Underhill-Galanti murders. See part I of this opinion, *supra*.

225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (Buckhout's specific testimony excluded); *United States v. Amaral*, 488 F.2d 1148, 1152–53 (9th Cir. 1973); *United States v. Collins*, 395 F.Supp. 629 (M.D.Pa.), aff'd, 523 F.2d 1051 (3rd Cir. 1975) (Buckhout's specific testimony excluded). *See also, United States v. Webb*, 625 F.2d 709, 710–11 (5th Cir. 1980) (trial court did not err in excluding expert testimony that defendant lacked "propensity to commit a violent act"); *United States v. Sims*, 617 F.2d 1371, 1374–75 (9th Cir. 1980) (trial court did not err in failing to appoint psychologist to assist defense through testimony on the unreliability of eyewitness identification).

3. The McMurray Identification of Hood

As part of its case on Count Ten the government introduced the testimony of Milton E. McMurray who identified Thevis, Evans and Hood as the persons he had seen together shortly after the Underhill-Galanti murders. McMurray did not come forward as a witness until September 5, 1979, when he advised prosecutors and the FBI that he had seen Thevis, Evans, and an unidentified man together in Evans' car around 12:10 and 12:25 p. m. the day of the Underhill-Galanti murders. McMurray described the unidentified man, but was not shown a photospread, lineup, or otherwise asked to identify him as Hood. On September 7, McMurray was interviewed by prosecutors at the United States Courthouse in Rome, Georgia, prior to testifying at trial; after the interview, he left for breakfast. Hood, meanwhile, had arrived early at the courthouse and was sitting with his wife on a bench in the hallway when McMurray returned. McMurray saw Hood and identified him to prosecutors as the man he had seen with Thevis and Evans. Hood now claims that this encounter was staged by prosecutors and violated his sixth amendment right to counsel. In addition, Hood asserts that even if the encounter did not violate his sixth amendment rights, it violated due process because it was unduly

suggestive and failed to meet the tests of reliability set forth in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

We reject both contentions. The record is devoid of any evidence that the prosecutors staged the encounter between McMurray and Hood; hence we conclude that the encounter was a purely inadvertent one which did not violate the sixth amendment. The parties do not dispute that Hood enjoyed a sixth amendment right to counsel at this stage of his criminal prosecution. *See Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *Lomax v. Alabama*, 629 F.2d 413, 414–15 (5th Cir. 1980), *cert. denied*, 450 U.S. 1002, 101 S.Ct. 1712, 68 L.Ed.2d 205 (1981). In *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Supreme Court held that an accused was entitled to counsel at a post-indictment encounter [30] to help avoid possible abuses in the identification procedure which could rob the defendant of a fair trial. *Id.* at 228–39, 87 S.Ct. at 1933–39. *See Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). The rationale stated by the Court was that:

the confrontation compelled *by the State* between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial.

*Wade, supra*, at 228, 87 S.Ct. at 1933 (emphasis added).

The Court's concern in these cases is with the misuse of identification procedures by the adverse party (prosecutor or police) which can result in a misidentification and erroneous conviction. Having opposing counsel present serves as a deterrent to such misuse and helps the defendant fully exercise his rights at trial by effectively reconstructing any unfairness in the identification procedures. *Id.* at 230–36, 87 S.Ct. at 1934–37. Consequently when an

---

**30.** The court stated that its rationale applied to lineups, "show-ups", or one-on-one confrontations. *Wade*, 388 U.S. at 229, 87 S.Ct. at 1933.

identification does not implicate the adversary process, the deterrent effect of counsel is unnecessary and the risk of prejudice negligible. A purely inadvertent meeting between the witness and the defendant does not involve any danger that the adverse party will abuse the identification process. Moreover, no "procedures" exist for defense counsel to reconstruct at trial. *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973) (holding that risks inherent in photographic displays did not warrant assistance of counsel). *See Gilbert v. California*, 388 U.S. 263, 265–67, 87 S.Ct. 1951, 1952–54, 18 L.Ed.2d 1178 (1967) (taking of handwriting exemplars did not require assistance of counsel because of "minimal risk that the absence of counsel might derogate from [a] fair trial"). We conclude, therefore, that the absence of counsel at a purely inadvertent meeting of a witness and defendant does not constitute a violation of the right to counsel.[31] *See United States v. Gentile*, 530 F.2d 461 (2d Cir.), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976) (dangers which prompted counsel requirement in *Wade* are absent in inadvertent identification).

 Finding no sixth amendment violation, however, does not end the inquiry. As the Supreme Court noted in *Kirby v. Illinois*, 406 U.S. 682, 690–91, 92 S.Ct. 1877, 1882–83, 32 L.Ed.2d 411 (1972), a court must scrutinize any pretrial confrontation for possible due process violations. The basic standard for due process violations is whether the identification procedure creates "a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). *See Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 196–98, 93 S.Ct. 375, 380–81, 34 L.Ed.2d 401 (1972). Accordingly, this circuit has adopted a two-step analysis of the due process issue:

First, as a threshold inquiry, the Court must decide whether the identification procedure was unnecessarily suggestive. A finding of impermissible suggestiveness raises concern over the reliability of identification and triggers closer scrutiny by the Court to determine whether such a procedure created a substantial risk of misidentification.

*Allen v. Estelle*, 568 F.2d 1108, 1112 (5th Cir. 1978). *See Preacher v. Estelle*, 626 F.2d 1222, 1223 (5th Cir. 1980), *cert. denied*, 450 U.S. 930, 101 S.Ct. 1389, 67 L.Ed.2d 362 (1981).

 We conclude that the identification at issue here was not unnecessarily suggestive. *See United States v. Davis*, 487 F.2d 112, 122 (5th Cir. 1973), *cert. denied*, 415 U.S. 981, 94 S.Ct. 1573, 39 L.Ed.2d 878 (1974) (observation of defendant by witness immediately prior to trial did not violate due process). The purely inadvertent meeting contained no hint of suggestiveness. The prosecutor did not show McMurray pictures of Hood or ask him to view Hood in a lineup. The prosecutor did not present Hood to McMurray and ask for an identification. Nor did the prosecutor even ask McMurray if he recognized the man in the hallway. Moreover, nothing about Hood suggested that he was a criminal defendant in this case. He was not handcuffed, for example, or standing alone among uniformed police officers. Far from being suggestive and unreliable, the spontaneous identification that resulted from McMurray's inadvertent meeting with Hood "might be said to emphasize the witness' reliability, rather than the reverse." *Allen v. Moore*, 453 F.2d 970, 974 (1st Cir. 1970), *cert. denied*, 406 U.S. 969, 92 S.Ct. 2422, 32 L.Ed.2d 668 (1972). Our conclusion is supported by numerous cases from other circuits holding that identifications resulting from inadvertent meetings do not violate due process. *E. g., United States v. Di Stefano*, 555 F.2d 1094, 1101–1102 (2d Cir. 1977); *United States v. Colclough*, 549 F.2d 937, 941–42 (4th Cir. 1977); *United States*

---

**31.** A contrary rule would violate common-sense. Obviously, attorneys cannot follow their clients or witnesses around twenty-four hours a day in order to prevent any chance meetings which could create sixth amendment problems.

v. *Freie*, 545 F.2d 1217, 1223–24 (9th Cir.), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1645, 52 L.Ed.2d 356 (1976); *United States v. Neverson*, 463 F.2d 1224, 1230–31 (D.C.Cir.1972).[32]

## IV. Miscellaneous Claims of Error

### A. *Errors in the Charge to the Jury*

### 1. The "Alter Ego" Instruction

Appellant Global claims as an additional ground of appeal error in the trial court's "alter ego" instruction to the jury. At the time the trial judge admitted the Underhill grand jury testimony, he instructed the jury that the evidence was admissible only against defendant Thevis. Later in the trial the government presented the testimony of Rodney Smith, a former Thevis employee and cellmate, to the effect that in 1977 Thevis claimed he still controlled Global. The court ruled that this evidence was inadmissible to prove that an agency relationship existed between Global and Thevis, and until other evidence proved the agency relationship, the Smith testimony constituted inadmissible hearsay as to Global. Nevertheless, in his final charge to the jury the judge instructed that if the jury found beyond a reasonable doubt that an agency relationship existed between Thevis and Global, or that Global was the "alter ego" of Thevis, it could consider against Global the acts, declarations, or knowledge of Thevis.[33] Global objected to this instruction

---

**32.** We do not hold, however, that an inadvertent encounter may never form the basis for due process relief. In *Green v. Loggins*, 614 F.2d 219 (9th Cir. 1980) the court held that an inadvertent encounter was nevertheless unnecessarily suggestive. In *Green*, a witness to a shooting went to a local police station to seek protective custody despite warnings that he was to have no contact with police until after an upcoming lineup. The station-house that the witness went to happened also to be the same one in which the defendant was being held. The witness was placed in a holding cell; a short time thereafter the defendant was placed in the same cell because he had been conferring with his attorney, and jail policy prohibited returning an inmate to his cell during a meal period. Some time later a booking officer asked both men their names, and the witness recognized the defendant. The court concluded that three aspects of the encounter made it unnecessarily suggestive: the setting strongly suggested to the witness that the defendant had been accused of a crime; the mention of the defendant's name immediately identified the defendant as the suspect in the witness' trial; and finally "the encounter was a result of the state's negligent exercise of its control over both the witness and the accused." *Id.* at 223. We find none of these factors present in the present case, and hence distinguish *Green*; we, however, express no opinion as to whether we agree with the result in that case.

**33.** The relevant instruction read:

Global Industries, Inc., is a defendant in this case. It is a corporation. A corporation is a legal entity or person, and a corporation may be found guilty of a criminal offense.

A corporation, of course, may only act through natural persons who are known as its agents and in general, any agent or representative of a corporation possessing adequate authority may bind the corporation by his acts, declarations and omissions.

Similarly, an act of an agent may be attributed to the corporation if that act done by the agent is done with the purpose of benefiting the corporation.

Whether the acts of individuals are to be attributed to the corporate defendant is a question of fact for you to decide just as other fact questions in this case.

While the acts, declarations or omissions of natural persons are admissible against those individuals, they are admissible against the corporate defendant only should you find as a matter of fact beyond a reasonable doubt that the acts, declarations or omissions were performed within the scope or authority of the agent or were performed by the agent for the purpose of benefiting the corporation, which acts the corporation had knowledge of.

A corporation may also be found guilty of a criminal offense if the individual actually performing the act is the alter ego of the corporation.

Taken literally, alter ego means "second self"; it is the legal theory whereby the separate legal personalities of an individual and a corporation are disregarded, because they are considered to be merged as a matter of law.

Before you could find that defendant Michael G. Thevis was the alter ego of defendant Global Industries, Inc., and the acts of one are the acts of the other, you would have to find beyond a reasonable doubt that defendant Michael G. Thevis was a controlling stockholder of Global Industries, Inc.; that he disregarded its separate corporate entity; that he utilized the corporation as a conduit for his personal business; and that the separate personalty of the defendant Michael G. Thevis and defendant Global Industries ceased to exist.

at the charge conference, but failed to preserve its objection after the court delivered its charge. Global now contends that the charge constituted reversible "plain error." We disagree.

■ Under Fed.R.Crim.P. 30, objections to jury instructions not timely made are waived unless the instruction constitutes "plain error." *E. g., United States v. Varkonyi*, 645 F.2d 453, 459 (5th Cir. 1981). "The obvious purpose of this provision is to inform the trial judge of possible errors so that he may have an opportunity to correct them." 8A J. Moore, Moore's Federal Practice ¶ 30.04 at 30–14 to 30–15. The "plain error" exception will not be invoked unless "the charge, considered as a whole, is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice," *Varkonyi, supra*, or "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Adams*, 634 F.2d 830, 836 (5th Cir. 1981).

■ In our judgment the charge did not constitute "plain error" under this standard. The Fifth Circuit has held that the trier of fact may disregard the corporate entity when the controlling shareholder uses the corporation purely as a conduit for personal business. *Baker v. Raymond International, Inc.*, 656 F.2d 173, 179 (5th Cir. 1981). Whether to disregard the corporate entity for that reason is a question of fact. *See Talen's Landing, Inc. v. M/V Venture, Inc.*, 656 F.2d 1157, 1160 (5th Cir. 1981). The challenged instruction substantially conveyed this circuit's substantive law of alter ego. *See Baker, supra*, at 180–81.[34]

Nevertheless, Global argues that the instruction constituted "plain error" for three reasons. First, Global asserts that the challenged instruction confused the jury as to what evidence was admissible against Global, in light of the trial court's earlier admonition not to consider the Underhill evidence against the corporation. While we agree that the charge may have been more precise, we do not think that the charge as given resulted in a "likelihood of a grave miscarriage of justice," especially when any ambiguity in the charge could have been corrected had an objection properly been made.

■ Global's second "plain error" argument is more complex. Global asserts that without the Underhill testimony admitted against the corporation as substantive evidence of guilt, the corporation's conviction on the RICO charges would have to be reversed due to insufficient evidence. The Underhill testimony, however, was admitted against Thevis only under the theory that he had waived his sixth amendment confrontation rights and his hearsay objection by killing Underhill. For the evidence to be admissible against Global, a similar waiver would be necessary; without it, considering the Underhill testimony against Global would violate Global's confrontation rights.[35]

In his order denying Global a judgment of acquittal or a new trial, the trial judge conceded that the instruction permitted the jury to consider the Underhill testimony

---

If you determine beyond a reasonable doubt that the defendant Michael G. Thevis was the alter ego of defendant Global Industries, Inc. as a question of fact, then you may attribute the acts and knowledge of defendant Michael G. Thevis to defendant Global Industries, Inc. I instruct you that you would not be authorized to convict defendant Michael G. Thevis or Global Industries, Inc. of any criminal offense as set forth in Counts One or Two of the indictment based merely upon the fact that Underhill was an employee of Thevis at the time Underhill committed a crime, if you find from the evidence that Underhill did.

**34.** In *Baker* this court delineated the appropriate context of an alter ego charge. While the charge given in this case failed to include cer-

tain factors listed in *Baker*, we do not find the variance so substantial as to render the charge "plain error." We would suggest, however, that in the future "alter ego" instructions follow the standards set forth in *Baker*.

**35.** The sixth amendment guarantees apply generally to an "accused"; a corporation which is a defendant at trial is an "accused" within the meaning of the amendment and enjoys the protection afforded by it. *See United States v. Rad-o-Lite*, 612 F.2d 740 (3d Cir. 1979) (holding that corporations enjoy a sixth amendment right to counsel); *United States v. R. L. Polk & Co.*, 438 F.2d 377 (6th Cir. 1971) (corporations have sixth amendment right to jury trial).

against Global if it found that an agency or alter ego relationship existed between Thevis and Global. In its opinion relating to the admission of the Underhill testimony, however, the trial court specifically stated that no evidence connected Global to the Underhill murder; hence Global did not directly waive its confrontation rights. *United States v. Thevis*, 84 F.R.D. 57, 72 (N.D. Ga.1979). The only other way in which Global's rights could be deemed waived is if Thevis' waiver could have been imputed to Global under an agency or alter ego theory; for one to have imputed Thevis' waiver to Global, however, the evidence would have had to show that an agency or alter ego relationship existed *at the time of the Underhill murder.* Global asserts that because the instruction failed to focus on the proper time frame, it permitted the jury to convict without having first found a proper waiver, thus violating its confrontation rights. Global contends, moreover, that no evidence existed to connect Thevis with Global at this crucial time.

While we agree that the trial judge's failure to specifically pinpoint the crucial time at which the alter ego relationship had to exist rendered the instruction objectionable,[36] this deficiency did not constitute "plain error." A fair interpretation of the instruction is that it required the jury to determine whether during the *entire period*

Global was the alter ego of Thevis. Thus the jury's guilty verdict against the corporation amounted to a finding that Thevis at no time properly observed the separate corporate identity. The evidence, moreover, supported the jury's finding. Viewing Thevis' sham sale of the pornography corporations to his secretary, his boast to Smith that he controlled the business from jail after this "sale", and the pattern of Thevis' criminal activity on behalf of the business revealed by various government witnesses [37] in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the jury was entitled to infer that Thevis historically had disregarded the corporate entity and continued to do so throughout the period in question, including the Underhill murder. Hence we hold that the instruction, while objectionable, was not so erroneous as to require reversal under the "plain error" standard.

Global's final "plain error" argument is that the instruction, by permitting the jury to consider as substantive evidence of guilt evidence which the trial court initially excluded as to the corporation, unfairly surprised the corporation and denied it effective confrontation of witnesses and due process. We find this argument specious. The alter ego theory of liability was pursued by the government throughout the

---

**36.** By permitting the jury to consider the Underhill statements against Global after finding an alter ego relationship, the instruction also erroneously submitted the waiver issue to the jury. Because a finding of waiver was a predicate to the admissibility of the Underhill statements, the waiver issue was one for the trial court to decide in accordance with the stringent standards set out in part IIIA of this opinion. *Cf. United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979) (trial court alone must decide admissibility of co-conspirators' statements). Nevertheless, submission of this issue to the jury did not constitute plain error inasmuch as the jury was required to find the existence of alter ego beyond a reasonable doubt, in contrast to the clear and convincing standard we approved for a judge-made waiver decision.

**37.** Although the trial court excluded the Smith testimony for the purpose of proving agency

under the settled rule that an agency may not be proven through the acts or declarations of the purported agent, he made no ruling as to the admissibility of the evidence on the issue of alter ego. Unlike agency, a substantial part of the proof of the existence of an alter ego relationship consists of evidence of how the person allegedly controlling the corporation treated the corporate entity. *See, e. g., Baker v. Raymond International, Inc.*, 656 F.2d 173, 179–81 (5th Cir. 1981). In this case, the government's theory throughout trial was that *Thevis* had disregarded the corporate entity such that alter ego theory applied. Hence, a key issue was whether Thevis had treated Global as a separate entity or, in contrast, as purely a conduit for his personal business. Any evidence admitted against Thevis, therefore, could properly be considered by the jury in assessing whether Thevis had so disregarded the corporate entity that he and the corporation were in fact one "person."

trial, and Global's counsel was well aware of the potential impact of the theory on the admissibility of evidence.[38] Hence the instruction neither unfairly surprised Global nor denied it any constitutional rights.

### 2. The Instruction to Decide Count Ten First

█ In its final instructions, the court charged the jury to deliberate first on Count Ten, the Underhill-Galanti murder count; if and only if they found Thevis guilty on that count, could they then consider the truth of the Underhill statements against Thevis as to Counts One and Two. Appellants requested this instruction, yet nevertheless contend on appeal that the instruction constituted plain error by giving the jury an artificial incentive to convict on Count Ten. According to appellants, the evidence of Thevis' guilt on Counts One and Two was plainly insufficient without Underhill's testimony. Thus, they continue, if the jury desired to convict Thevis on Counts One and Two, it could not do so unless it first found him guilty of Count Ten.

We find this assertion highly speculative. The instruction, moreover, actually served to benefit the defendants by providing a doublecheck on the trial court's earlier waiver ruling.[39] We therefore need not decide if the instruction constituted error;[40] we are satisfied that it did not constitute reversible "plain error" under the precedents cited above.

### B. *The Request for Severance*

█ Appellants Evans and Hood contend that the trial court abused its discretion in refusing to grant their motion under Fed.R.Crim.P. 14 to sever Count Ten from the remaining counts. "The test in this circuit for reviewing the denial of a severance is that the defendant must be unable to obtain a fair trial without severance and must demonstrate compelling prejudice

against which the trial court will be unable to afford protection." *United States v. Swanson*, 572 F.2d 523, 528 (5th Cir.), *cert. denied*, 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978). *See United States v. Grapp*, 653 F.2d 189, 192–93 (5th Cir. 1981); *United States v. Salomon*, 609 F.2d 1172, 1175 (5th Cir. 1980). The trial court denied the pre-trial severance motions of Evans and Hood, finding that the jury could "reasonably be expected to separate the indictments or the defendants and to evaluate the evidence properly and individually against each." *United States v. Thevis*, 474 F.Supp. 117, 132 (N.D.Ga.1979) (quoting *United States v. Harris*, 458 F.2d 670, 673 (5th Cir.), *cert. denied*, 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972)). In its pre-trial severance order, the court noted its continuing duty at all stages of the trial to grant a severance if prejudice did appear, and stated "this Court remains ready to enter such an order, if it becomes apparent that a jury is incapable of isolating the proof among the several defendants and charges." 474 F.Supp. at 133.

We find that such prejudice never materialized, and that the trial court acted within its discretion in refusing to grant Evans and Hood's motions for severance. This was not a case with an extraordinarily large number of defendants in which the jury might have difficulty keeping the evidence separated as to each defendant. Moreover, the trial court was extremely careful throughout the trial to instruct the jury that the racketeering evidence against Thevis and Global had no connection with Evans and Hood. At the beginning of the government's presentation of the RICO evidence, the trial court specifically instructed the jury that the trial was entering a new phase and that none of the racketeering evidence would pertain to Evans and Hood. We agree with the trial court that Evans

---

**38.** In closing argument, for example, Global's counsel conceded that the corporation could be guilty only if Thevis was guilty; counsel then spent his entire closing argument attempting to refute Thevis' guilt.

**39.** See part III A of this opinion, *supra*.

**40.** *Cf. United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979) (trial judge alone must decide admissibility of co-conspirators' statements).

and Hood did not show the "compelling prejudice" necessary to warrant a discretionary severance under Rule 14.

### C. The Sufficiency of the Evidence Claims

#### 1. Evans and Hood

Both appellants Evans and Hood claim that the evidence was insufficient to convict them on Count Ten. They do not deny that they helped Thevis after his escape from jail and are therefore guilty of harboring a fugitive; rather, they emphatically deny that they knew Thevis was planning to silence Underhill. Without this knowledge, they argue, they cannot be found guilty of the Count Ten conspiracy.

■■■ We reject appellants' contentions. For a defendant to be convicted of a conspiracy, the prosecution must prove beyond a reasonable doubt that a conspiracy existed, that the accused knew of it, and that he intended to join or associate himself with the objectives of it. *United States v. Malatesta*, 590 F.2d 1379, 1381 (5th Cir.) (en banc), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). *See United States v. Bland*, 653 F.2d 989, 996 (5th Cir. 1981). Participation in a conspiracy, however, need not be shown by direct evidence; a jury may infer a common purpose or plan from a "development and a collection of circumstances." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). *See United States v. Marx*, 635 F.2d 436, 439 (5th Cir. 1981) ("Defendant's assent to a conspiracy may be inferred from acts which furthered the conspiracy."); *United States v. Malatesta, supra*, at 1381.

■■■ The role of an appellate court in reviewing the sufficiency of the evidence is strictly limited. Whether for conspiracy or other crimes and whether the evidence is circumstantial or direct, *see United States v. Fox*, 613 F.2d 99, 101 (5th Cir. 1980), the test for reviewing sufficiency is that a jury verdict "must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *Hamling v. United States*, 418 U.S. 87, 124,

94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974) (quoting *Glasser, supra*, 315 U.S. at 80, 62 S.Ct. at 469). *See Malatesta, supra*, at 1381–82. This court has interpreted the "substantial evidence" test as evidence which would permit a reasonable jury to find guilt beyond a reasonable doubt, *United States v. Fox, supra*, at 101, or, alternatively, evidence such that a reasonable jury could conclude was inconsistent with every reasonable hypothesis of innocence. *United States v. Garcia*, 655 F.2d 59, 62 (5th Cir. 1981); *United States v. Berry*, 644 F.2d 1034, 1039 (5th Cir. 1981).

■■■ We find that the evidence against Evans and Hood met this standard. The record showed that Evans and Hood not only harbored Thevis but took a number of other actions which, viewed in the light most favorable to the government, indicated they were aware of the conspiratorial purpose to silence Underhill. Both Evans and Hood contacted a cousin about silencers for a .38 pistol and a 30.06 rifle. The day before the murder Evans visited a former associate real estate broker to inquire about the Underhill property, despite earlier having told the associate not to have anything to do with this property because of Underhill's involvement with Thevis. Later that same day Hood ran a license check on the car Underhill was driving. The jury could reasonably conclude that these actions and the other activities of Evans and Hood related in part I of this opinion were inconsistent with any hypothesis of innocence, including the "mere" harboring of Thevis.

#### 2. Global

Global claims that because the trial court's alter ego instruction constituted reversible "plain error," [41] the Underhill testimony could not be considered as substantive evidence of guilt against it. Without this testimony, Global asserts, the evidence is insufficient to convict it of the RICO charges. As we have decided that the alter ego instruction was not plain error, the Underhill testimony properly could be con-

41. See part IV A 1 of this opinion, *supra*.

sidered against Global, and the evidence was sufficient to sustain the conviction.

## V. Conclusion

In accordance with our decision we affirm the convictions of all defendants on all counts.

AFFIRMED.