[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 8, 2012
JOHN LEY
CLERK

No. 10-15877

D. C. Docket No. 1:09-cr-00286-RWS-JKF-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DWIGHT DARYL OWENS,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Georgia

(June 8, 2012)

**ORDER ON PETITION FOR REHEARING EN BANC**

Before DUBINA, Chief Judge, TJOFLAT, EDMONDSON, CARNES,
BARKETT, HULL, MARCUS, WILSON, PRYOR, MARTIN and JORDAN,
Circuit Judges.

BY THE COURT:

The court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure), the Suggestion of Rehearing En Banc and the Petition for Rehearing are **DENIED.**

   /s/ Joel F. Dubina
Chief Judge

BARKETT, Circuit Judge, dissenting from the denial of rehearing en banc:

Having been given the opportunity to change our court's position that appellate courts are never permitted to review for abuse of discretion the exclusion of expert testimony regarding the reliability of eyewitness identifications, we should avail ourselves of it. That isolated position, established thirty years ago, conflicts with all of the other circuits[1] and all but five of the states[2] that have considered the question. I cannot think of any reason, legal or logical, why such a ruling should not be subject to the same abuse of discretion standard as any other

---

[1] See, e.g., United States v. Brien, 59 F.3d 274, 277 (1st Cir. 1995) ("We are unwilling to adopt a blanket rule that qualified expert testimony on eyewitness identification must routinely be admitted or excluded."); United States v. Serna, 799 F.2d 842, 850 (2d Cir. 1986) (reviewing decision to exclude expert testimony for abuse of discretion), abrogated on other grounds by United States v. DiNapoli, 8 F.3d 909, 914 n.5 (2d Cir. 1993) (en banc); United States v. Stevens, 935 F.2d 1380, 1400-01 (3d Cir. 1991) (holding that it was an abuse of discretion to prohibit expert testimony); United States v. Harris, 995 F.2d 532, 534-35 (4th Cir. 1993) (discussing circumstances in which it may be an abuse of discretion to exclude expert testimony); United States v. Moore, 786 F.2d 1308, 1312-13 (5th Cir. 1986) (reviewing for abuse of discretion); United States v. Smithers, 212 F.3d 306, 317 (6th Cir. 2000) ("[E]xpert testimony should be admitted . . . when there is no other inculpatory evidence presented against the Defendant with the exception of a small number of eyewitness identifications."); United States v. Hall, 165 F.3d 1095, 1106 (7th Cir. 1999) (reviewing for abuse of discretion); United States v. Blade, 811 F.2d 461, 465 (8th Cir. 1987) (same); United States v. Rincon, 28 F.3d 921, 926 (9th Cir. 1994) (emphasizing that decision to admit or exclude expert testimony requires "an individualized inquiry" in each case); United States v. Rodriguez-Felix, 450 F.3d 1117, 1124 (10th Cir. 2006) (reviewing for abuse of discretion and noting that "[t]he majority of other circuits also reject per se exclusion of this type of expert testimony.").

[2] See George Vallas, A Survey of Federal and State Standards for the Admission of Expert Testimony on the Reliability of Eyewitnesses, 39 Am. J. Crim. L. 97, app. B (2011) (reporting that only five states–Kansas, Louisiana, Nebraska, Oregon, and Pennsylvania–continue to hold that expert testimony is per se inadmissible, whereas the vast majority of states review the exclusion of expert eyewitness testimony under some form of abuse of discretion standard).

evidentiary ruling in a trial, <u>especially</u> in light of what we know today, thirty years later, about eyewitness identification. Our continued adherence to a rule that disfavors this form of testimony is indefensible in light of the science supporting its usefulness. Our doing so is particularly unjustifiable given that we <u>do</u> review the exclusion of polygraph evidence,[3] which is widely condemned as unreliable by courts and experts![4]

Dwight Owens was convicted of armed robbery based on the identifications of the victims who picked him out of a photographic lineup. The court excluded expert testimony about scientific evidence that undermined confidence in the witnesses' ability to correctly perceive and recall the appearance of the robbers. This court held that it was barred from reviewing the decision to exclude the expert's testimony by our precedent in <u>United States v. Thevis</u>, 665 F.2d 616 (11th Cir. 1982).

<u>Thevis</u> was decided on the premise that "the problems of perception and memory can be adequately addressed in cross-examination and . . . the jury can

---

[3] <u>See, e.g.</u>, <u>United States v. Henderson</u>, 409 F.3d 1293, 1301-04 (11th Cir. 2005) (reviewing decision to exclude polygraph evidence for abuse of discretion under the analysis prescribed in <u>United States v. Piccinonna</u>, 885 F.2d 1529, 1536 (11th Cir. 1989) (en banc)).

[4] <u>See</u> <u>United States v. Scheffer</u>, 523 U.S. 303, 309-10 (1998) ("To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques. . . . This lack of scientific consensus is reflected in the disagreement among state and federal courts concerning both the admissibility and the reliability of polygraph evidence.").

adequately weigh these problems through common-sense evaluation." Thevis, 665 F.3d at 641. In the thirty years subsequent to Thevis, however, over two-thousand studies on eyewitness memory have been published making clear that the premise of Thevis does not justify a categorical rule of non-review.[5] Indeed, the U.S. Supreme Court recently cited the use of expert testimony in state courts as an important "safeguard" against unreliable identifications. See Perry v. New Hampshire, 132 S. Ct. 716, 729 (2012). The ten other circuits and forty-two state courts[6] that disagree with our approach have recognized that expert testimony can be helpful to the jury precisely because "the conclusions of the psychological studies are largely counter-intuitive, and serve to 'explode common myths about

---

[5] Report of the Special Master at 9, New Jersey v. Henderson, 27 A.3d 872 (N.J. 2011) [hereinafter Special Master Rpt.] (reporting a "high degree of consensus" in the "over two thousand studies on eyewitness memory [that] have been published in a variety of professional journals over the past 30 years"). In 2009, the Supreme Court of New Jersey ordered that a plenary hearing be held before a Special Master "to consider and decide whether the assumptions and other factors reflected in [Manson v. Brathwaite, 432 U.S. 98 (1977)] . . . remain valid and appropriate in light of recent scientific and other evidence" regarding the reliability of eyewitness identifications. Special Master Rpt. at 3 (internal quotation marks omitted). At a ten-day hearing participated in by the defendant, the State of New Jersey, the Innocence Project, and the Association of Criminal Defense Lawyers of New Jersey, the Special Master received testimony from seven experts in the fields of psychology, law, and law enforcement, and reviewed "[m]ore than 200 published scientific studies, articles and books" selected from the extensive literature and entered in the record. Id. The Supreme Court of New Jersey adopted the Special Master's Report and revised the State's procedures for testing the reliability of eyewitness identifications under Manson to reflect the scientific advances discussed in the Report. See Henderson, 27 A.3d at 919-926.

[6] See Vallas, supra note 2, app. B (listing state courts that have adopted discretionary standards for admitting expert testimony on eyewitness identifications).

5

an individual's capacity for perception.'" United States v. Moore, 786 F.2d 1308, 1312 (5th Cir. 1986) (quoting United States v. Smith, 736 F.2d 1103, 1105 (6th Cir. 1984)).

This overwhelming body of scientific research, which has "established beyond any doubt that eyewitness testimony has the potential to be dangerously unreliable," and that "eyewitness misidentification remains the leading cause of false convictions in the United States,"[7] was unavailable when Thevis was decided. The unreliability of eyewitness testimony is now widely recognized in the psychological literature and by law enforcement.[8] Studies conducted in both experimental and real-world settings have revealed eyewitness misidentification

---

[7] Id. at 98.

[8] See Brandon L. Garrett, Convicting the Innocent: Where Criminal Prosecutions Go Wrong 48-49 (2011) (discussing criticism of eyewitness identification procedures in psychological literature); Special Master Rpt. at 51-58 (surveying responses of law enforcement agencies and organizations to psychology studies); Tanja Rapus Benton et al., Eyewitness Memory is Still Not Common Sense: Comparing Jurors, Judges and Law Enforcement to Eyewitness Experts, 20 Applied Cognitive Psychol. 115, 115 (2006) (observing that "eyewitness identification errors are the principal cause of wrongful convictions in the United States" and citing additional studies); Gary L. Wells et al., Eyewitness Identification Procedures: Recommendations for Lineups and Photo Spreads, 22 Law & Hum. Behav. 603, 605 (1998) ("[E]yewitness identification evidence is among the least reliable forms of evidence and yet is persuasive to juries."). In recognition of the threat posed by biased lineup procedures to the accuracy of eyewitness identifications, the Florida Department of Law Enforcement recently required all state and local law enforcement agencies to adopt policies intended to address many of the flaws in lineup identifications that have been demonstrated in the psychology literature. See Florida Dep't of Law Enforcement et al., Standards for Florida State and Local Law Enforcement Agencies in Dealing With Photographic or Live Lineups in Eyewitness Identification 3 (June 15, 2011), available at http://www.fdle.state.fl.us/Content/getdoc/327876c5-0464-4ecb-832a-79962c5e09a9/Guidelines EyewitnessID.aspx (last visited June 4, 2012).

rates varying between one-quarter and one-half of all identifications, depending on the factors being tested. See Special Master Rpt. at 15-18. At the same time, jurors remain uninformed of these causes of eyewitness errors and therefore are unable to evaluate their impact on the reliability of eyewitness testimony.[9]

These studies have also undermined the notion that cross examination is an effective instrument to educate the jury about the limitations of eyewitnesses' capacity to make accurate identifications. Witnesses are often unaware of the contextual factors that may have skewed their perception toward identifying a particular suspect as the culprit and therefore are unable to explain the influence of these factors to the jury on cross examination.[10] Even when eyewitnesses are subjected to intensive cross examination about the circumstances surrounding

_____

[9] See Benton et al., supra note 8, at 119-20 (reporting results of survey finding that jurors and experts agreed on the influence of tested factors in only 13% of issues surveyed); Saul M. Kassin & Kimberly A. Barndollar, The Psychology of Eyewitness Testimony: A Comparison of Experts and Prospective Jurors, 22 J. of Applied Soc. Psychol. 1241, 1245 (1992) (reporting significant disagreement between scientific opinion and lay witness opinion about factors affecting eyewitness identification accuracy in 13 of 21 areas tested); see also Vallas, supra note 2, at pt. III.F (reporting findings from additional studies).

[10] See Gary L. Wells & Lisa E. Hasel, Eyewitness Identification: Issues in Common Knowledge and Generalization, in Beyond Common Sense: Psychological Science in the Courtroom 170 (Eugene Borgida & Susan T. Fiske, eds., 2008) ("[P]eople do not have the kind of introspective access that would permit reliance on their response to such questions [about the reliability of their identifications.] People often report that a variable did not influence them when it actually did, as well as reporting that a variable influenced them when it actually did not.").

their identifications, research has shown only a marginal improvement in jurors' ability to distinguish erroneous identifications from accurate ones.[11]

The scientific literature in this field has demonstrated that expert testimony is especially valuable in cases where the eyewitness identification has been influenced by one of several factors that undermine accuracy and these factors are typically unknown to jurors and cannot be explained through examination of a lay witness. See United States v. Rodriguez-Felix, 450 F.3d 1117, 1125 (10th Cir. 2006) ("[A]n expert's testimony describing how certain factors, falling outside a typical juror's experience, may affect a eyewitness's identification is the very type of scientific knowledge to which Daubert's relevance prong is addressed."); United States v. Stevens, 935 F.2d 1380, 1400 (3d Cir. 1991) (reversing where misidentification was the key issue at trial and expert's proposed testimony was outside the realm of typical juror knowledge); United States v. Moore, 786 F.2d 1308, 1313 (5th Cir. 1986) ("In some cases casual eyewitness testimony may make

---

[11] Jennifer L. Devenport & Steven D. Penrod, Eyewitness Identification Evidence: Evaluating Commonsense Evaluations, 3 Psychol. Pub. Pol'y & L. 338, 348 (1997) (reporting that, in a study of 201 mock jurors evaluating the accuracy of identifications by forty-two eyewitnesses, only 27% were able to identify the inaccurate identifications when those witnesses were exposed to leading cross examination, as opposed to 14% who were able to identify when exposed to non-leading cross examination); see also Garrett L. Berman & Brian L. Cutler, Effects of Inconsistencies in Eyewitness Testimony on Mock-Juror Decision Making, 81 J. Applied Psychol. 170, 174-75 (1996) (reporting that there is little correlation between the existence of inconsistencies in witnesses' testimony that might be exposed on cross examination and the accuracy of their identifications).

the entire difference between a finding of guilt or innocence. In such a case expert eyewitness identification testimony may be critical."); United States v. Smith, 736 F.2d 1103, 1106 (6th Cir. 1984) (recognizing that expert testimony on eyewitness identification "might have refuted [jurors'] otherwise common assumptions about the reliability of eyewitness identification"). In such cases, "[i]t will not do to reply that jurors know from their daily lives that memory is fallible. The question that social science can address is how fallible, and thus how deeply any given identification should be discounted." United States v. Bartlett, 567 F.3d 901, 906 (7th Cir. 2009).

Many of the characteristic flaws of eyewitness identification that can be highlighted and explained only by an expert are implicated in this case. For example, Owens' conviction depended heavily upon the eyewitnesses' identification of him in a photo array conducted by an officer who was involved in the investigation as opposed to one conducted by an officer without knowledge of the suspect's identity. According to a "broad consensus" in the scientific literature, "the reliability of eyewitness testimony is highly dependent on the police procedures used in conducting lineups." Special Master Rpt. at 19. When the lineup or photo array administrator knows who the suspect is, it is virtually inevitable that the administrator's behavior will influence the witness's choice in

making an identification. See New Jersey v. Henderson, 27 A.3d 872, 896 (N.J. 2011) (citing analysis of 345 studies concluding that "[t]he overall probability" that administrator expectations do not influence the subject "is near zero"). Thus, the rate of accurate identifications in comparison to inaccurate identifications doubles when a blind procedure is used instead of a non-blind identification. Special Master Rpt. at 20-21. Despite the strength of the lineup administrator's influence, "neither the administrator nor the witness is ordinarily aware of either the unintentional suggestions or their impact; accordingly, neither is in position to report or dissipate the taint." Id. at 20.

Contrary to our assumptions in Thevis, it is not a subject of everyday knowledge that "even the best-intentioned[] non-blind administrator can act in a way that inadvertently sways an eyewitness."[12] See generally John S. Shaw et al., A Lay Perspective on the Accuracy of Eyewitness Testimony, 29 J. of Applied Soc. Psychol. 52, 65 (1999) (reporting that jury-eligible research subjects tend to be less aware of biasing effects of police activity than contextual influences). But the biasing effects of non-blind lineup administration cannot be exposed on cross examination because both the witness and the administrator are often unaware that these cues have been given. See Henderson, 27 A.3d at 896-97 (citing studies).

_____

[12] Henderson, 27 A.3d at 897.

10

Nor is a non-expert witness qualified to testify to the impact of these cues, even if the witness is aware of them.

Indeed, in Owens' case, there was evidence of overt biasing signals. Instructing the witness to "pick one" of the photographs from a lineup, as was done in this case, has been shown to encourage witnesses to assume that the police have arrested the actual perpetrator and that it would be incorrect to respond that they do not recognize <u>any</u> of the individuals in the lineup. <u>See</u> Brandon L. Garrett, <u>Convicting the Innocent: Where Criminal Prosecutions Go Wrong</u> 60 (2011).

The initial description given to the police by one of the eyewitnesses in Owens' case differed substantially from the description given during a suppression hearing conducted after the eyewitness had identified Owens. The change in the witness's description of the perpetrator before and after seeing Owens implies the effect of what researchers refer to as "confirmatory feedback," which is the process by which a witness's memory of an event changes to conform to suggestions made after witnessing the event. <u>See</u> Special Master Rpt. at 37 (discussing various examples of this effect); <u>Henderson</u>, 27 A.3d at 253-54. The literature suggests that such a change could be caused by the witness viewing a

suspect's image in a photo array.[13]  However, this phenomenon cannot be explained by cross examining a lay witness, nor is it a matter of common intuition that viewing the suspect's image in more than one photo array can distort an eyewitness's actual memory of events.

Moreover, the robber whom the witnesses later identified as Owens brandished and fired a weapon during the course of the robbery, which was, by all accounts, a high-stress experience for both witnesses.[14]  Both the high levels of stress experienced by the witnesses and the display of a weapon tend to undermine the accuracy of an eyewitness's identification.  Although jurors may believe, and prosecutors may argue, that a witness to a traumatic event will "never forget the face" due to the trauma the witness experienced, high levels of stress actually undermine the witness's ability to record and recall accurate memories of crime-related details.  See Henderson, 27 A.3d at 904.  The problem is exacerbated when the perpetrator brandishes a weapon because the weapon "diverts a witness's

_____

[13] This type of feedback also inflates a witness's confidence in the accuracy of his or her identification.  Although there is widespread agreement among psychologists that confidence is not an indicator of accuracy, lay jurors tend to believe just the opposite.  See Benton et al., supra note 8, at 119-20 (reporting disagreement between psychologists and sampled lay jurors); see also Kassin & Barndollar, supra note 8, at 1245 (same).

[14] After one of the robbers fired a gun into the air, one witness was grabbed by one of the robbers and both witnesses were forced to kneel on the ground.  The robbers fled the store after taking money from the cash register and several items on display in the store.  See United States v. Owens, No. 10-15877, slip op. at 6-7 (11th Cir. Oct. 13, 2011).

attention away from the face of the perpetrator and reduces the witness's ability to encode, describe and identify the face." Special Master Rpt. at 44; see also Garrett, supra note 8, at 72 (discussing effect of weapon focus in exoneration cases). The effect of a brandished weapon is particularly pronounced in crimes of short duration, such as the robbery of which Owens was convicted. See Special Master Rpt. at 44. Moreover, most jurors remain unaware that the presence of a weapon, by itself, reduces the chances of an accurate identification. See Benton et al., supra note 8, at 120 (reporting that only 39% of sampled jurors understood the effect of weapon focus). But without expert testimony, the jurors in Owens' trial remained unable to consider whether these significant perceptual limitations may have affected the accuracy of the eyewitnesses' identifications.

In short, scientific research reveals that, in particular circumstances, an eyewitness's testimony suffers from intrinsic flaws that are unknown to most jurors and undetectable through the typical modes of examining lay witnesses. Accordingly, our assumptions in Thevis that "the problems of perception and memory can be adequately addressed in cross-examination and . . . the jury can adequately weigh these problems through common-sense evaluation" no longer support a categorical exemption from appellate review. Thevis, 665 F.2d at 641.

Although the majority of trial judges have recognized the value of expert testimony on the reliability of eyewitness identification and permit it where useful, our court has not revised its isolated position today prohibiting review of the exclusion of such testimony even when it constitutes an abuse of discretion. I believe en banc review is warranted to restore appellate consideration and ensure the fairness and reliability of our trial procedures in this important context.